# United States Court of Appeals
## For the First Circuit

No. 19-1848

BERNARD WAITHAKA, on behalf of himself and
all others similarly situated,

Plaintiff, Appellee,

v.

AMAZON.COM, INC.; AMAZON LOGISTICS, INC.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez, and Thompson, Circuit Judges.

David B. Salmons, with whom James P. Walsh, Jr., Noah J.
Kaufman, Michael E. Kenneally, and Morgan, Lewis & Bockius LLP
were on brief, for appellants.
Harold L. Lichten, with whom Shannon Liss-Riordan, Adelaide
H. Pagano, and Lichten & Liss-Riordan, P.C. were on brief, for
appellee.
Archis A. Parasharami and Mayer Brown LLP on brief for the
Chamber of Commerce of the United States of America and the
National Association of Manufacturers, amici curiae.
Corbin K. Barthold, Richard A. Samp, and Washington Legal
Foundation on brief for Washington Legal Foundation, amicus
curiae.
Toby J. Marshall, Blythe H. Chandler, Elizabeth A. Adams,
Terrell Marshall Law Group PLLC, Jennifer D. Bennett, and Public

<u>Justice</u> on brief for Public Justice, amicus curiae.

_____

July 17, 2020

_____

**LIPEZ**, **Circuit Judge**.  This putative class action requires us to decide whether employment contracts of certain delivery workers -- those locally transporting goods on the last legs of interstate journeys -- are covered by the Federal Arbitration Act ("FAA" or the "Act"), given its exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.  We have not considered the scope of the exemption since the Supreme Court held in Circuit City Stores, Inc. v. Adams, 532 U.S. 105 (2001), that this provision is limited to employment contracts of "transportation workers."  After close examination of the text and purpose of the statute and the relevant precedent, we now hold that the exemption encompasses the contracts of transportation workers who transport goods or people within the flow of interstate commerce, not simply those who physically cross state lines in the course of their work.

Plaintiff-appellee Bernard Waithaka, a so-called "last mile" delivery driver for defendants-appellants Amazon.com, Inc. ("Amazon.com") and its subsidiary, Amazon Logistics, Inc. ("Amazon Logistics"),[1] falls within this category of transportation workers whose contracts are exempt from the FAA.  Hence, we conclude that the FAA does not govern the enforceability of the mandatory

_____

[1] We refer collectively to appellants as "Amazon."

- 3 -

arbitration provision of his employment agreement with appellants. Because that provision prohibits proceeding on a class basis, either in the arbitral or judicial forum, we also agree with the district court that the arbitration provision is unenforceable under state law. Therefore, we affirm the district court's denial of appellants' motion to compel arbitration.

## I.

### A.    Factual Background[2]

Amazon.com and Amazon Logistics are based in Seattle, Washington. Amazon sells retail products online to customers throughout the United States. To "ensure that millions of packages reach their final destination as efficiently as possible," Amazon Logistics provides package delivery services "through the last mile of the order." Amazon attributes its success as "one of the world's largest online retailers," in part, to its "accurate and timely package delivery."

Historically, Amazon has used third-party delivery providers, such as FedEx, UPS, and the United States Postal Service, to deliver its products. In recent years, however, Amazon has also begun to contract with independent contractors for

---

[2] "Because [Amazon's] motion to compel arbitration was made in connection with a motion to dismiss or stay, we draw the relevant facts from the operative complaint and the documents submitted to the district court in support of the motion to compel arbitration." Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018).

- 4 -

delivery services through its Amazon Flex ("AmFlex") smartphone application. These contractors, like Waithaka, sign up for delivery shifts and then use their own methods of transportation -- typically, a private vehicle -- to deliver products ordered through Amazon within a specified timeframe and in compliance with other Amazon service standards. AmFlex contractors are paid an hourly rate for their delivery shifts. But if contractors require more time than a normal shift to complete all of their deliveries, they are not compensated for the additional time. Nor do they receive any reimbursement for their gas, car maintenance, or cellphone data expenses.

To begin work with AmFlex, a prospective contractor must download the AmFlex app, create an account, login, and agree to the AmFlex Independent Contractor Terms of Service (the "Agreement" or the "TOS"). The second paragraph of the TOS states:

> YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH **FINAL AND BINDING ARBITRATION**, UNLESS YOU OPT OUT OF ARBITRATION WITHIN 14 CALENDAR DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT, AS DESCRIBED BELOW IN SECTION 11.

Section 11 of the Agreement (the "dispute resolution section") further explains the arbitration requirement and also states that the parties waive their rights to bring class actions:

**11. Dispute Resolution, Submission to Arbitration.**

a) SUBJECT TO YOUR RIGHT TO OPT OUT OF ARBITRATION, THE PARTIES WILL RESOLVE BY FINAL AND BINDING ARBITRATION, RATHER THAN IN COURT, ANY DISPUTE OR CLAIM, WHETHER BASED ON CONTRACT, COMMON LAW, OR STATUTE, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT, INCLUDING TERMINATION OF THIS AGREEMENT, TO YOUR PARTICIPATION IN THE PROGRAM OR TO YOUR PERFORMANCE OF SERVICES. TO THE EXTENT PERMITTED BY LAW, THE PRECEDING SENTENCE APPLIES TO ANY DISPUTE OR CLAIM THAT COULD OTHERWISE BE ASSERTED BEFORE A GOVERNMENT ADMINISTRATIVE AGENCY.

b) TO THE EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS OR COLLECTIVE BASIS.

. . .

g) THIS AGREEMENT SHALL NOT BE INTERPRETED AS REQUIRING EITHER PARTY TO ARBITRATE DISPUTES ON A CLASS, COLLECTIVE OR REPRESENTATIVE BASIS, EVEN IF A COURT OR ARBITRATOR INVALIDATES OR MODIFIES OR DECLINES TO ENFORCE THIS AGREEMENT IN WHOLE OR IN PART.[3]

Two parts of the Agreement pertain to the parties' choice of law. The dispute resolution section includes a provision stating that "the Federal Arbitration Act and applicable federal law will govern any dispute that may arise between the parties."

---

[3] For clarity, we refer to the provision of the dispute resolution section that relates to the arbitration requirement (subsection a) as the "arbitration provision" and those provisions that relate to class claims (subsections b and g, as well as several other provisions of Section 11 that reiterate that the Agreement does not permit the parties to pursue claims or receive relief on a class basis) as the "class waiver provisions."

In a separate section (the "governing law section"), the TOS indicates the law that governs the interpretation of the Agreement:

**12. Governing Law.**

The interpretation of this Agreement is governed by the law of the state of Washington without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law.

Finally, the Agreement includes a severability provision, which states that "[i]f any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law."

Waithaka, a resident of Massachusetts, "on-boarded" into the AmFlex program on January 13, 2017, and accepted the TOS on that same date. He did not opt out of the arbitration agreement. Since 2017, Waithaka has collected packages for delivery in Massachusetts and has not crossed state lines in the course of his deliveries.

B. **Procedural Background**

Waithaka filed this action in Massachusetts state court in August 2017, asserting three claims against Amazon: (1) misclassification of AmFlex drivers as independent contractors, rather than employees; (2) violation of the Massachusetts Wage Act

by requiring AmFlex drivers to "bear business expenses necessary to perform their work"; and (3) violation of the Massachusetts Minimum Wage Law. He seeks to bring these claims on behalf of himself and "individuals who have worked as delivery drivers for [appellants] in the Commonwealth of Massachusetts and have been classified as independent contractors."

Although Amazon timely removed the case to federal court, the district court remanded the case after concluding that the putative class did not meet the requisite amount in controversy for jurisdiction pursuant to the Class Action Fairness Act ("CAFA"). Waithaka v. Amazon.com, Inc., No. 17-40141-TSH, 2018 WL 4092074, at *3 (D. Mass. Aug. 28, 2018). However, Amazon was successful when it again removed the case in September 2018. Concluding that the amount in controversy had increased since the first removal and that the second removal was not time-barred, the district court denied Waithaka's second motion to remand. Waithaka v. Amazon.com, Inc., 363 F. Supp. 3d 210, 212-14 (D. Mass. 2019).

In April 2019, Amazon moved to compel arbitration pursuant to the TOS, or, in the alternative, to transfer the case to the United States District Court for the Western District of Washington so that the case could proceed with similar, earlier-filed litigation that was pending. In August 2019, the district court denied in part and granted in part the motion. Waithaka v. Amazon.com, Inc., 404 F. Supp. 3d 335, 339 (D. Mass. 2019).

Specifically, the district court concluded that Waithaka's Agreement was exempt from the FAA, that Massachusetts law therefore governed the enforceability of the arbitration provision, and that the provision was unenforceable based on Massachusetts public policy. Id. at 343, 346, 348. However, the court granted appellants' alternative request to transfer the case, which has since occurred.[4] Id. at 349-51.

Amazon timely filed this appeal, challenging the district court's denial of the motion to compel arbitration. The parties agreed to stay the Washington proceedings pending the resolution of the appeal.

## II.

The interpretation of arbitration agreements and the issuance of orders compelling arbitration, or declining to do so, are subject to de novo review. Gove v. Career Sys. Dev. Corp., 689 F.3d 1, 4 (1st Cir. 2012). Similarly, we review de novo choice of law determinations. Robidoux v. Muholland, 642 F.3d 20, 22 (1st Cir. 2011).

### A. Background of the FAA

Congress passed the FAA in 1925 "to overcome judicial hostility to arbitration agreements." Circuit City, 532 U.S. at 118 (quoting Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S.

---

[4] The district court's decision to transfer the case is not challenged in this appeal.

265, 272-73 (1995)). The Act reflects a "liberal federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), and provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable," 9 U.S.C. § 2 (emphasis added). The Supreme Court has held that the phrase "involving commerce" in Section 2 -- referred to as the "coverage" provision of the FAA, Circuit City, 532 U.S. at 115 -- reflects Congress's "intent to exercise [its] commerce power to the full," Allied-Bruce, 513 U.S. at 277.

Despite the broad scope of Section 2, the FAA does not apply to all contracts that include arbitration provisions. Section 1 of the Act exempts employment contracts of certain categories of workers from the Act's coverage. See 9 U.S.C. § 1. Specifically, the Act does not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Id. This case concerns the scope of the residual clause of that exemption: "or any other class of workers engaged in foreign or interstate commerce."

In Circuit City the Supreme Court rejected the contention that Section 1 exempts from the FAA's coverage all

employment contracts. 532 U.S. at 119. Instead, it held that the provision exempts "only contracts of employment of transportation workers." Id. In reaching this conclusion, the Court articulated principles for interpreting the FAA, and Section 1 in particular.

First, phrases similar to the language of Section 1 -- "in commerce" and "engaged in commerce" -- are terms of art that have not been interpreted as expansively as the phrase "involving commerce," the terminology used in Section 2. Id. at 115-16. To reach that conclusion, the Court examined how these respective phrases had been interpreted in other statutory contexts. Id. at 116-17 (citing Jones v. United States, 529 U.S. 848, 855 (2000) (interpreting federal arson statute); United States v. Am. Bldg. Maint. Indus., 422 U.S. 271, 279-80 (1975) (interpreting Clayton Act); Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 199-202 (1974) (interpreting Robinson-Patman Act and Clayton Act); FTC v. Bunte Bros., Inc., 312 U.S. 349, 350-51 (1941) (interpreting Federal Trade Commission Act)). Second, the residual clause must be interpreted in light of the specifically enumerated categories of workers that directly precede it, consistent with the ejusdem generis canon of statutory construction.[5] Id. at 114-15. Third,

---

[5] Pursuant to this canon of construction, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Circuit City, 532 U.S. at 114-15 (alteration in original) (quoting 2A

the Act's pro-arbitration purpose counseled in favor of narrowly construing the Section 1 exemption. Id. at 118-19. Finally, while there was "sparse" legislative history on the Section 1 exemption, id. at 119, excluding transportation workers from the FAA's coverage was consistent with "Congress'[s] demonstrated concern with transportation workers and their necessary role in the free flow of goods," id. at 121.

**B.    Scope of the Transportation Worker Exemption**

Using the principles articulated in Circuit City as a guide, we turn now to the interpretive question raised in this case: does Waithaka belong to a "class of workers engaged in foreign or interstate commerce," such that his contract with appellants is exempt from the FAA's coverage?

In answering that question, we note that the Supreme Court recently held that the Section 1 exemption does not apply exclusively to contracts of "employees," but rather to "agreements to perform work," including those of independent contractors. New Prime Inc. v. Oliveira, 139 S. Ct. 532, 544 (2019). Accordingly, there is no dispute that the independent contractor agreement at issue here would fall within the Section 1 exemption if Waithaka qualifies as a transportation worker.

---

Norman J. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)).

Importantly, in New Prime, the Court supplemented the interpretive guidance of Circuit City by instructing that we must interpret the Section 1 exemption according to the "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute."  139 S. Ct. at 539 (alterations in original) (internal quotation marks omitted) (quoting Wisc. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2074 (2018)).  As a threshold matter, the parties disagree about which words within the exemption (the Act does not apply "to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1 (emphasis added)) are important to our interpretive task.  Amazon asserts that the key to understanding the scope of the residual clause is the meaning of the phrase "interstate commerce."  Whether the contracts of a group of workers fall within the ambit of the clause, Amazon contends, turns on the activities the workers were hired to perform.  Only if the workers' activities themselves qualify as "interstate commerce"[6] can they qualify as transportation workers whose employment contracts are exempt from the FAA.  Because Waithaka and his fellow local delivery drivers

---

[6] Because the parties do not contend that Waithaka "engaged in foreign . . . commerce," we focus only on the meaning of "engaged in . . . interstate commerce."  See 9 U.S.C. § 1.

do not personally carry goods across state lines and engage only in intrastate activities, Amazon maintains that they are not covered by the residual clause.

Waithaka counters that "engaged in" is the crucial phrase for understanding the exemption. When the FAA was enacted in 1925, Waithaka insists, there was an understanding that workers could be "engaged in . . . interstate commerce" without crossing state lines; rather, this phrase included workers who "transport[ed] goods or passengers (or facilitat[ed] the transportation of goods and passengers) within a single state that [were] ultimately going to or coming from another state."

We agree with Waithaka that understanding the scope of the residual clause turns not only on the definition of "interstate commerce," but also on the words that precede that phrase: "engaged in." The Court in Circuit City did not look solely to the phrase "interstate commerce" to interpret the scope of the Section 1 exemption. Rather, it emphasized the significance of the words modifying that phrase. 532 U.S. at 115-17. Therefore, to determine what it meant to be "engaged in" interstate commerce in 1925, and thus whether Waithaka and his fellow AmFlex workers fall within the scope of the transportation worker exemption, we consider the interpretation of statutes contemporaneous with the FAA, the sequence of the text of the exemption, the FAA's

- 14 -

structure, and the purpose of the exemption and the FAA itself. Cf. id. at 111-21.

## 1. Contemporaneous Statutes

In considering the scope of the phrase "engaged in" interstate commerce, the Court in Circuit City first rejected an argument that it should give the phrase "a broader construction than justified by its evident language" simply because the FAA was enacted at a time when Congress's power to regulate pursuant to the Commerce Clause was circumscribed. 532 U.S. at 116-18. The petitioner in Circuit City asserted that, because the phrase "engaged in . . . interstate commerce," as it was understood in 1925, "came close to expressing the outer limits of Congress['s Commerce Clause] power as then understood," the Court should interpret the Section 1 exemption to be co-extensive now with the more expansive modern understanding of the Commerce Clause. Id. at 116. According to the logic of the petitioner's argument, Congress likely thought in 1925 that it was excluding all employment contracts within the scope of its Commerce Clause authority, and, hence, the Court should interpret Section 1 as exempting the broader range of contracts that are now understood to be within Congress's Commerce Clause authority. See id.

The Court rejected that argument, concluding that it would lead to a constantly shifting understanding of the meaning of the statutory language. Id. at 117. Rather, the Court affirmed

that its task in interpreting Section 1 was to assess the meaning of the words in the exemption when written. See id. at 117-19. Thus, it looked to the interpretation of similar phrases in statutes contemporaneous to the FAA. Id. at 117-18. Relying on its interpretation of the phrase "engaged in commerce" in the Clayton Act, enacted in 1914, the Court noted that this jurisdictional phrase "appears to denote only persons or activities within the flow of interstate commerce." Id. at 118 (quoting Gulf Oil Corp., 419 U.S. at 195). That definition reflected "[t]he plain meaning of the words 'engaged in commerce,'" which "is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce'" -- phrases that have been interpreted as expressing Congress's intent to exercise its Commerce Clause power to its fullest extent.[7] Id.

Consistent with the approach used in Circuit City, Waithaka urges us to consider the Court's interpretation of a similar jurisdictional phrase in the Federal Employers' Liability

_____

[7] In Circuit City, the Court acknowledged that common jurisdictional phrases like "engaged in interstate commerce" do not "necessarily have a uniform meaning whenever used by Congress." 532 U.S. at 118 (quoting Am. Bldg. Maint. Indus., 422 U.S. at 277). Although Amazon seizes on this language, asserting that this admonition means we would be remiss to rely on the meaning given to these jurisdictional phrases in contemporaneously passed statutes, Amazon overstates the Court's qualification. By using as one of our interpretive tools the Court's interpretation of statutes contemporaneous with the FAA, we simply follow the Court's lead.

- 16 -

Act (the "FELA"), which he contends is particularly helpful for understanding what it meant for a transportation worker to be "engaged in interstate commerce" at the time of the FAA's enactment in 1925. Passed in 1908, the FELA contains language nearly identical to that of Section 1 of the FAA. 45 U.S.C. § 51 (1908); see Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437, 207 F.2d 450, 453 (3d Cir. 1953) (noting that Congress "must have had [the FELA] in mind" when drafting the residual clause in Section 1 of the FAA, given that Congress "incorporat[ed] almost exactly the same phraseology" into the FAA).

In relevant part, that statute provided that "[e]very common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." 45 U.S.C. § 51 (1908). Congress passed this version of the FELA after the Supreme Court held that an earlier version -- which had provided coverage to all employees of a carrier engaged in interstate commerce -- went beyond Congress's Commerce Clause power, as it was then understood, and was therefore unconstitutional. See The Employers' Liability Cases, 207 U.S. 463, 498-99, 504 (1908). Unlike the earlier version, the amended statute provided coverage only when both the railroad and the employee were "engaged in interstate commerce" at the time of the

- 17 -

injury.[8]  Second Employers' Liability Cases, 223 U.S. 1, 51-52 (1912).

In numerous cases, the Supreme Court considered when a railroad employee was "engaged in interstate commerce," such that the FELA provided coverage for injuries sustained on the job. Whether a worker had moved across state lines was not dispositive. Rather, the Court concluded that workers "engaged in interstate commerce" did not refer only to those workers who themselves carried goods across state lines, but also included at least two other categories of people: (1) those who transported goods or passengers that were moving interstate, see, e.g., Phila. & Reading Ry. Co. v. Hancock, 253 U.S. 284, 285-86 (1920), and (2) those who were not involved in transport themselves but were in positions "so closely related" to interstate transportation "as to be practically a part of it," see Shanks v. Del., Lackwanna, & W.R.R. Co., 239 U.S. 556, 558-59 (1916) (collecting cases).

Although Waithaka contends that both categories supply helpful guidance for assessing whether workers with activities similar to his would have been "engaged in . . . interstate

---

[8] Although the text of the FELA refers to workers "employed" in interstate commerce, the cases interpreting the statute say that the words "employed" and "engaged" are interchangeable. See, e.g., Phila., B. & W.R.R. Co. v. Smith, 250 U.S. 101, 102, 104 (1919) (considering whether employee was "engaged in interstate commerce within the meaning of the statute" and concluding that "he was employed . . . in interstate commerce").

commerce" in 1925, we limit our focus to the first group -- those who transported goods themselves.  Because there is no dispute that Waithaka and other AmFlex workers are involved in such transport, the FELA precedents pertaining to the narrower category of workers who were themselves transporting goods that were moving between states are most relevant for our purpose.  Accordingly, we do not determine whether the second category of workers considered to be "engaged in interstate commerce" for purposes of the FELA -- those who were "engaged in interstate commerce" by virtue of the close relationship between their work and interstate transportation -- are also transportation workers "engaged in . . . interstate commerce" for purposes of the FAA.[9]

We therefore focus on the FELA precedents pertaining to workers who were transporting goods that were moving interstate

---

[9] In declining to consider the applicability of this second line of cases from the FELA context to the FAA, we do not imply that the contracts of workers "practically a part" of interstate transportation -- such as workers sorting goods in warehouses during their interstate journeys or servicing cars or trucks used to make deliveries -- necessarily fall outside the scope of the Section 1 exemption.  Some of our sister circuits have described Section 1 as covering workers "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it."  See, e.g., Tenney, 207 F.2d at 452.  And in 1925 the preceding categories of "seamen" and "railroad employees" were understood to include workers who were not themselves engaged in transportation activities.  See New Prime, 139 S. Ct. at 542-43 (noting that "[a]t the time of the [FAA]'s passage, shipboard surgeons who tended injured sailors were considered 'seamen'").  Nevertheless, we choose to decide this case narrowly, leaving for another day the resolution of the "closely related to" question.

-- consistent with Circuit City's own focus on "the flow of interstate commerce." Examining these cases reveals that the Court consistently has held that a worker transporting goods that had come from out of state or that were destined for out-of-state locations was "engaged in interstate commerce," even if the worker's role in transporting the goods occurred entirely within a single state. In Seaboard Air Line Railway v. Moore, 228 U.S. 433 (1913), the Court held that a railroad worker thrown from a train was "engaged in interstate commerce" at the time of his injury because the train was hauling two freight cars of lumber in Florida that were destined for New Jersey. Id. at 434-35. And, in Philadelphia & Reading Railway Co. v. Hancock, 253 U.S. 284 (1920), the Court concluded that an injured railroad worker who was operating a train loaded with coal to be shipped out of state was engaged in interstate commerce, even though he was operating the train exclusively in Pennsylvania as it carried coal two miles from a coal mine to a railroad storage yard. Id. at 285-86. The Court noted that

> [t]he coal was in the course of transportation
> to another state when the cars left the mine.
> There was no interruption of the movement; it
> always continued towards points as originally
> intended. The determining circumstance is
> that the shipment was but a step in the
> transportation of the coal to real and
> ultimate destinations in another state.

Id. at 286. Ultimately, the Court concluded that a "trainman" was employed in interstate commerce "if any of the cars in his train contained interstate freight." Id. at 285.

However, when a railroad worker was working on a railroad car that was not carrying goods destined for or coming from another state, the Court drew the line and concluded that the worker was not, at that point, "engaged in interstate commerce." See Ill. Cent. R.R. Co. v. Behrens, 233 U.S. 473, 477-78 (1914) (holding that a worker moving several freight cars "all loaded with intrastate freight" within the city of New Orleans when he was fatally injured was not engaged in interstate commerce).

Amazon marshals several reasons why these FELA precedents do not shed light on the meaning of "engaged in . . . interstate commerce" within Section 1 of the FAA. First, Amazon contends that Circuit City dismisses the FELA specifically as irrelevant to interpreting the FAA. This contention misconstrues Circuit City. There, the Court referenced two cases interpreting the FELA in recognizing that, in the early twentieth century, "engaged in interstate commerce" "came close to expressing the outer limits of Congress'[s] power as then understood." 532 U.S. at 116 (citing The Employers' Liability Cases, 207 U.S. at 498, and Second Employers' Liability Cases, 223 U.S. at 48-49). However, by discussing these cases and, as we have already noted, refusing to interpret the phrase "engaged in interstate commerce"

based on the modern understanding of the Commerce Clause power, the Court did not, as Amazon contends, dismiss the FELA as irrelevant for interpreting the meaning of those words in the FAA. Hence, by looking to these FELA precedents to understand the original meaning of the phrase in 1925, we are not engaging in a method of interpretation that Circuit City forbids.

Amazon also asserts that these FELA cases are inapt because the focuses of the FELA and the FAA differ. Whether a class of workers' employment contracts are exempt from the FAA turns on whether the workers are "engaged in . . . interstate commerce," whereas the FELA's coverage, according to Amazon, turned on whether a railroad carrier for whom an injured employee worked was engaged in interstate commerce. But this argument overlooks Congress's amendments to the FELA in 1908 and the holding of the Second Employers' Liability Cases described above: the FELA applied only when both the carrier and the injured employee had been engaged in interstate commerce. 223 U.S. at 51-52. That is, the FELA was concerned with the activities of employees, just as the FAA is. Indeed, in Moore, Hancock, and Behrens -- the FELA precedents that we have discussed, the question before the Court was the same as it is here: whether certain transportation workers engaged in interstate commerce.

Amazon also contends that, because the FELA is a remedial statute that has been construed liberally, see Atchison, Topeka &

Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 561-62 (1987), it is a poor guide for interpreting the FAA exemption, which must be given "a narrow construction" in light of the FAA's purpose, see Circuit City, 532 U.S. at 118-19. Specifically, Amazon emphasizes that the remedial purpose of the FELA may have, in certain circumstances, influenced the Court's interpretation of the scope of the FELA's coverage. See Shanks, 239 U.S. at 558 (noting that, given "the nature and usual course of the business to which the [FELA] relates and the evident purpose of Congress in adopting" it, the phrase "engaged in interstate commerce" should not be interpreted in a "technical legal sense" and thus should include those workers "so closely related" to interstate transportation "as to be practically a part of it"). However, there is no indication that the remedial purpose of the FELA affected the Supreme Court's conclusion that injured railroad workers who were transporting within one state goods destined for or coming from other states -- activities comparable to those performed by Waithaka -- were engaged in interstate commerce. See, e.g., Hancock, 253 U.S. at 285-86 (concluding, without reference to the purpose or liberal construction of the FELA, that a worker engaged

exclusively in local transport of goods destined for another state was "engaged in interstate commerce").[10]

Thus, contrary to Amazon's contentions, the FELA cases concerning workers directly involved in transport advance our understanding of the Section 1 exemption. Consistent with the Supreme Court's focus on "the flow of interstate commerce" in Circuit City, these cases show that workers moving goods or people destined for, or coming from, other states -- even if the workers were responsible only for an intrastate leg of that interstate journey -- were understood to be "engaged in interstate commerce" in 1925.

To test this conclusion about the original meaning of the residual clause, based on the FELA precedents, we look to the other interpretive principles identified in Circuit City, which Amazon insists support its reading of Section 1.

## 2. Sequence of the Words in Section 1

Amazon contends that a textual feature of the residual clause supports its position that the Section 1 exemption covers only workers who themselves cross state lines. Specifically, Amazon notes that the phrase "engaged in . . . interstate commerce"

---

[10] Again, we do not imply that the contracts of workers "so closely related" to interstate transportation "as to be practically a part of it" fall outside (or inside) the scope of the Section 1 exemption. See Shanks, 239 U.S. at 558. We are simply maintaining our focus on those workers who themselves transport goods.

follows "any class of workers" in the residual clause, without reference to the business of the engaging company. Because of this sequence, Amazon contends that the activities of the workers themselves are the crux of the exemption, without consideration of the geographic footprint and nature of the business for which they work.

Although our ultimate inquiry is whether a class of workers is "engaged in . . . interstate commerce," the question remains how we make that determination. The nature of the business for which a class of workers perform their activities must inform that assessment. After all, workers' activities are not pursued for their own sake. Rather, they carry out the objectives of a business, which may or may not involve the movement of "persons or activities within the flow of interstate commerce," Circuit City, 532 U.S. at 118 (quoting Gulf Oil Corp., 419 U.S. at 195) -- the crucial concept reflected in the FELA precedents. See Singh v. Uber Techs. Inc., 939 F.3d 210, 227-28 (3d Cir. 2019) (noting that, on remand, the district court might consider "information regarding the industry in which the class of workers is engaged" and "information regarding the work performed by those workers," among other factors, to determine whether a group of workers is "engaged in interstate commerce" and thus exempt from the FAA). Moreover, the language of the residual clause does not foreclose taking into account the company's business when considering how to

classify the nature and activities of the workers at issue. Accordingly, Amazon's contention about the textual focus of the exemption does not alter our conclusion that we may consider the nature of the business to assess whether workers' activities include the transportation of goods or people in the flow of interstate commerce.

This conclusion faithfully adheres to the ejusdem generis canon, invoked by the Court in Circuit City. Consideration of the nature of the hiring company's business carries out the Supreme Court's instruction that we must construe the residual clause of Section 1 consistently with the specific preceding categories of workers -- "seamen" and "railroad employees" -- whose employment contracts are exempt from the FAA. See Circuit City, 532 U.S. at 114-15. Plainly, these groups, defined by the nature of the business for which they work, demonstrate that the activities of a company are relevant in determining the applicability of the FAA exemption to other classes of workers.

By considering the nature of the business to help determine whether its workers are transporting goods or people moving in interstate commerce, we do not ignore the importance of the workers' own connection to interstate commerce as Amazon contends. And, to be clear, we do not hold that a class of workers must be employed by an interstate transportation business or a business of a certain geographic scope to fall within the Section

1 exemption.  We simply point out, as is evident here, that the nature of the business for which the workers perform their activities is important in determining whether the contracts of a class of workers are covered by Section 1.

### 3. Structure of the Residual Clause and the FAA

In another effort to bolster its limited interpretation of the exemption, Amazon points to the broader structure of the FAA.  In Circuit City, the Supreme Court noted that "engaged in . . . interstate commerce" in Section 1 must be interpreted more narrowly than "involving commerce" in Section 2 of the FAA.  Id. at 115-16.  Amazon argues that interpreting the residual clause to encompass workers who are transporting goods within the flow of interstate commerce eliminates the distinction between Sections 1 and 2 and conflates the phrase "engaged in . . . interstate commerce" with "involving commerce," contrary to the Supreme Court's directive in Circuit City.

This argument plainly fails.  In Circuit City, the Supreme Court rejected the view that Section 1 encompasses all employment contracts with a connection to interstate commerce -- a construction that would treat the words "engaged in . . . interstate commerce" as reflecting "congressional intent to regulate to the full extent of [Congress's] commerce power," i.e., to have the same reach as the Court previously had given to the phrase "involving commerce" in Section 2.  Id. at 114-15.  In

- 27 -

dismissing that construction of Section 1, the Court stated that the operative jurisdictional words in Section 2 -- "involving commerce" -- connote a broader reach than the words "engaged in . . . interstate commerce," and similar terms of art, which refer only to "persons or activities within the flow of interstate commerce." Id. at 118 (quoting Gulf Oil Corp., 419 U.S. at 195); see also Allied-Bruce, 513 U.S. at 273 (noting that operative jurisdictional words in Section 2 of the FAA -- "involving commerce" -- were broader than the "often-found words of art 'in commerce,'" which referred only to "'persons or activities within the flow of interstate commerce'") (emphasis in original) (citing Am. Bldg. Maint. Indus., 422 U.S. at 276)).

Thus, Circuit City itself preserves a distinction between the different phrases in Sections 1 and 2. We are not negating that distinction, as Amazon contends, by reading Section 1's exemption to cover certain transportation workers who do not personally cross state lines, based on their particular tasks and the nature of the business of their employers. To the contrary, our conclusion that the residual clause exempts the contracts of workers transporting goods or people within the flow of interstate commerce adopts the meaning of the phrase "engaged in . . . interstate commerce" that the Court itself said preserved the distinction between the two phrases used in Sections 1 and 2. Hence, nothing in the structure of the FAA alters our understanding

of the original meaning of the "engaged in . . . interstate commerce" language of the residual clause.

### 4. Purpose of the FAA

In a further effort to convince us that the residual clause applies only when a worker transports goods across state lines, Amazon argues that the contracts of Waithaka and his fellow local delivery workers cannot be covered by the residual clause for two additional reasons: (1) exempting the employment agreements of such local workers would be inconsistent with the pro-arbitration purpose of the FAA and the Supreme Court's instruction, in light of the Act's purpose, that we narrowly construe Section 1; and (2) adopting Waithaka's view of the exemption would make it difficult to administer and, thus, frustrate the Act's goal of reducing litigation on the enforceability of arbitration agreements.

We recognize that the FAA was enacted to counter hostility toward arbitration and that, accordingly, we must narrowly construe the statutory exemption from the Act. See Circuit City, 532 U.S. at 111, 118-19. However, the FAA's pro-arbitration purpose cannot override the original meaning of the statute's text. See New Prime, 139 S. Ct. at 543 (rejecting a narrower construction of the FAA's exemption provision, even though that construction advanced the Act's pro-arbitration policy). Moreover, construing the exemption to include workers

- 29 -

transporting goods within the flow of interstate commerce advances, rather than undermines, "Congress'[s] demonstrated concern with transportation workers and their necessary role in the free flow of goods." See Circuit City, 532 U.S. at 121.

Amazon also offers a more tailored argument about the statute's purpose and legislative history. In Circuit City, the Supreme Court observed that Congress may have carved out the contracts of seamen and railroad employees from the FAA because of existing alternative dispute resolution schemes for those groups of workers. Id. at 120-21. By that logic, Amazon contends, Congress could not have intended to exempt local delivery drivers like Waithaka because no such alternative exists for them.

Amazon's argument is unavailing for several reasons. First, the Supreme Court in Circuit City specifically disclaimed reliance on this legislative history as the basis for its holding. Id. at 119. Rather, the text of Section 1 determined the outcome of that case. Id. at 119-21. Indeed, the Court stated that the legislative history of Section 1 was "quite sparse." Id. at 119.

Second, the Court addressed congressional intent only in response to an argument that construing the residual clause to exempt only transportation workers would "attribute[] an irrational intent to Congress." Id. at 121. The Court explained that "[i]t is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that

- 30 -

it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers," and that "[i]t would be rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation."  Id.  However, in offering this explanation for Congress's exemption of certain transportation workers, the Court did not say that Section 1 applied exclusively to transportation workers for whom an alternative dispute resolution system existed.  We see no basis for treating the Court's inference about Congress's rationale for excluding specific industries as a principle limiting the application of the transportation worker exemption going forward.  See Singh, 939 F.3d at 224-26.  Indeed, the residual clause means that Congress contemplated the future exclusion of workers other than railroad employees and seamen, and it did not limit that exclusion to those with available alternative dispute resolution systems.  Purpose cannot override text.  See New Prime, 139 S. Ct. at 543.  If Congress had wished, it could have exempted only "seamen" and "railroad employees," but, as enacted, Section 1's exemption also includes a residual clause.

Amazon's argument about the Act's purpose to reduce litigation over arbitration agreements fares no better.  Amazon contends that a decision in Waithaka's favor would introduce uncertainty about the FAA's coverage and spawn extensive

litigation about the scope of the residual clause. This scenario, Amazon maintains, would "undermin[e] the FAA's pro[-]arbitration purposes and 'breed[] litigation from a statute that seeks to avoid it.'" Circuit City, 532 U.S. at 123 (quoting Allied-Bruce, 513 U.S. at 275). But, as Waithaka points out, the notion that Amazon's proposed standard would create an easily administrable, bright-line rule is illusory. If crossing state lines were the touchstone of the exemption's test, the parties would still engage in discovery to determine how often a class of workers moved interstate and would litigate what portion of a given group of workers must cross state lines and with what frequency to qualify as a class of workers "engaged in . . . interstate commerce."

Moreover, the line-drawing conundrum that Amazon identifies would not stem from our decision. Rather, it is a product of Circuit City itself. In concluding that the residual clause does not encompass all employment contracts, but only those of transportation workers, the Court left it to the lower courts to assess which workers fall within that category. Doing so unavoidably requires the line-drawing that courts often do.

### 5. Conclusion

In sum, we reject Amazon's cramped construction of Section 1's exemption for transportation workers. The original meaning of the phrase "engaged in . . . interstate commerce," revealed by the FELA precedents, and the text, structure, and

purpose of the FAA, all point to the same conclusion: Waithaka and other last-mile delivery workers who haul goods on the final legs of interstate journeys are transportation workers "engaged in . . . interstate commerce," regardless of whether the workers themselves physically cross state lines.[11] By virtue of their work transporting goods or people "within the flow of interstate commerce," see Circuit City, 532 U.S. at 118, Waithaka and other AmFlex workers are "a class of workers engaged in . . . interstate commerce." Accordingly, the FAA does not govern this dispute, and it provides no basis for compelling the individual arbitration required by the dispute resolution section of the Agreement at issue here.

**III.**

Having concluded that the FAA does not govern the enforceability of the dispute resolution section of the Agreement, with its requirement of individual arbitration, we must now decide whether such arbitration may still be compelled pursuant to state law. Because the parties dispute which state's law -- that of Washington or Massachusetts -- governs that enforceability question, our analysis proceeds in two parts. First, we analyze

---

[11] Although Amazon has relied heavily on the fact that Waithaka has not crossed state lines in the course of performing his AmFlex work, Amazon has never contested that products he and other AmFlex workers deliver cross state lines to reach their final destinations.

- 33 -

the contract's choice-of-law and severability language to determine the governing law.  We conclude that the contract selects the law of Washington.  Then, we consider whether conflict-of-law principles permit the enforceability of that contractual choice of Washington law.  Because we conclude that Massachusetts would treat the class waiver provisions in the Agreement as contrary to the Commonwealth's fundamental public policy and that, based on conflict-of-laws principles, the contractual choice of Washington law would be unenforceable if it would permit such waivers, we decide that individual arbitration cannot be compelled pursuant to state law here.  We proceed with an explanation of these conclusions.

## A.    Contractual Governing Law

To demonstrate that Washington law applies, Amazon points to two aspects of the Agreement: the governing law section and the severability provision.  To reiterate, the governing law section states that "[t]he interpretation of this Agreement is governed by the law of the state of Washington without regard to its conflict of laws principles, except for [the dispute resolution section], which is governed by the [FAA] and applicable federal law."  The severability provision states that "[i]f any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and

- 34 -

enforceable provisions be enforced to the fullest extent permissible under applicable law."

Amazon asserts that, read in combination, these two aspects of the Agreement require that Washington law governs the enforceability of the class waiver and arbitration provisions in the Agreement. Anticipating the possibility that the FAA might not apply to Waithaka's claims, Amazon advocates striking the provision in the governing law section stating that the "FAA and applicable federal law" govern the dispute resolution section of the Agreement, which includes the class waiver and arbitration provisions.[12] Likewise, the portion of the dispute resolution section stating that "the Federal Arbitration Act and applicable federal law [will] govern any dispute that may arise between the parties" must be severed. What remains is an express choice of Washington law to govern the "interpretation of the Agreement," regardless of Washington's conflict-of-laws principles.

Waithaka asserts a different reading of the Agreement. Given that the governing law section states that Washington law will apply to the interpretation of the entire Agreement except

_____

[12] Waithaka argues that Amazon forfeited this argument by failing to explain in its briefing to the district court how the severability provision affected the choice-of-law analysis. However, the severability argument was raised below and the district court addressed it in a footnote in its decision. See Waithaka, 404 F. Supp. 3d at 344 n.4. We conclude that Amazon sufficiently preserved this argument and developed it on appeal.

the dispute resolution section, Waithaka argues that Amazon cannot now claim that Washington law applies to that section in lieu of the FAA.  Since Amazon did not specify in the Agreement what law applies to the dispute resolution section in the event a court concludes that the FAA is inapplicable, as we have here, Waithaka contends that there is no applicable contractual choice of law. In that absence, Massachusetts law applies to the enforceability of the arbitration provision in the dispute resolution section and its waiver of any class action proceedings.  Waithaka urges that Amazon should bear the burden of failing to anticipate the present scenario and, like the district court, we should hold Amazon to its own "inartful drafting."  Waithaka, 404 F. Supp. 3d at 344 n.5.

We agree with Waithaka and the district court that Amazon could have specified more clearly what law applies to the dispute resolution section when the FAA is inapplicable.[13]  See, e.g.,

---

[13] We note another puzzling aspect of the governing law section: its intended scope.  While the section's directive that "[t]his agreement is governed by the law of the state of Washington without regard to its conflict of laws principles" makes abundantly clear Amazon's strong preference for that state's law, which might be ousted by the application of Washington's own conflict-of-law principles, we wonder why Amazon limited that choice of Washington law to the "interpretation of the Agreement." Ultimately, however, we disagree with Waithaka's position that this limitation means that Washington law does not apply to the dispute resolution section of the Agreement. As Amazon points out, the governing law section describes the FAA as, in effect, governing "[t]he interpretation of . . . [the dispute resolution section]."  Thus,

Palcko v. Airborne Express, Inc., 372 F.3d 588, 590 (3d Cir. 2004) (interpreting a choice-of-law provision that stated explicitly that "[t]o the extent that the [FAA] is inapplicable, Washington law pertaining to agreements to arbitrate shall apply"). But Amazon's shortcomings in drafting the Agreement do not alter our ultimate conclusion: the severability argument put forward by Amazon -- to which Waithaka fails to provide any rebuttal -- prevails. Because the FAA is inapplicable, the portions of the governing law and dispute resolution sections selecting the FAA must be stricken from the Agreement, leaving Washington law as the default choice of law for assessing the enforceability of the arbitration and class waiver provisions of the parties' contract.

## B.   Conflict-of-Law Analysis

Despite the contractual choice of Washington law, Waithaka contends that arbitration nevertheless cannot be compelled pursuant to state law. He offers two arguments to support that conclusion. First, relying on Scott v. Cingular Wireless, 161 P.3d 1000 (Wash. 2007) (en banc), he contends that arbitration cannot be compelled even under Washington law. But to the extent Washington law would permit the arbitration provision to be enforced, he asserts that the contractual choice of

---

if the FAA is inapplicable and Washington law applies as a fallback, Washington law must apply to the interpretation of the dispute resolution section just as the FAA would.

Washington law is itself unenforceable under a conflict-of-law analysis.  As he puts it, a contractual choice of law cannot deprive him of "unwaivable statutory rights under Massachusetts law," including the right to bring his claims as a class action. According to Waithaka's conflict-of-law argument, the dispute resolution section of the Agreement does not simply require an arbitral forum.  It also includes the class waiver provisions that apply to both judicial and arbitral forums.  Including such class waiver provisions in employment contracts, Waithaka contends, violates fundamental Massachusetts public policy.  He therefore insists that, based on conflict-of-law principles, the contractual choice of Washington law is unenforceable if it would permit the class waiver provisions.  We proceed to analyze Waithaka's second argument, assuming for purposes of deciding whether arbitration can be compelled here that Washington law would permit the class waiver provisions in the Agreement.[14]

Before we assess this conflict-of-law argument, we must pose a question.  Even if the class waiver provisions are unenforceable, as Waithaka argues, could he still be forced to bring his claims in an arbitral forum, albeit as a class action?

---

[14] If Waithaka prevails on his conflict-of-law argument but our assumption about Washington law is incorrect, the outcome in this case would be the same.  That is, if the class waiver provisions are in fact unenforceable under Washington law, arbitration could not be compelled pursuant to state law, albeit based on Washington rather than Massachusetts law.

The Agreement itself answers that question. It "does not provide for, and the parties do not consent to, arbitration on a class, collective or representative basis." The Agreement states explicitly that it "shall not be interpreted as requiring either party to arbitrate disputes on a class, collective or representative basis, even if a court or arbitrator invalidates or modifies or declines to enforce this Agreement in whole or in part." In other words, the class waiver provisions cannot be severed from the rest of the dispute resolution section. If they are unenforceable, the arbitration provision is also unenforceable.[15] Thus, our assessment of Waithaka's conflict-of-law argument -- that the class waiver provisions are unenforceable -- will be dispositive of the final question presented here: can arbitration be compelled at all pursuant to state law?

We therefore turn to Waithaka's conflict-of-law argument. We begin by reviewing the statutory claims he asserts and Massachusetts's treatment of class waivers in the context of such claims. We then undertake a conflict-of-law analysis,

---

[15] Our conclusion that we cannot order class arbitration based on the terms of the Agreement is consistent with the Supreme Court's conclusion that class arbitration may not be compelled unless the arbitration agreement specifically contemplates that form of arbitration. As the Supreme Court put it, the "changes brought about by the shift from bilateral arbitration to class-action arbitration" are "fundamental." See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 686 (2010).

- 39 -

considering the contractual governing law and Massachusetts public policy.

### 1.   Statutory Claims and Massachusetts Public Policy

Waithaka asserts three claims on behalf of himself and others similarly situated under the Massachusetts Wage Act, the Independent Contractor Misclassification Law, and the Minimum Wage Law.  Mass. Gen. Laws ch. 149, §§ 148, 148B & ch. 151, § 1.[16]  For each of these statutory provisions, Massachusetts law creates a private right of action by which a person "may institute and prosecute in his own name and on his own behalf, or <u>for himself and for others similarly situated</u>, a civil action for injunctive relief, for any damages," and other relevant relief.  <u>Id.</u> ch. 149, § 150 & ch. 151, § 20 (emphasis added).  The right to pursue classwide relief for Wage Act and Independent Contractor Misclassification Law claims is further protected by a provision that precludes the contractual waiver of certain rights under those statutes.  <u>Id.</u> ch. 149, § 148.  This anti-waiver provision states that "[n]o person shall by a special contract with an employee or by any other means exempt himself from" Section 150, which, in turn, provides the statutory right to pursue Wage Act and

---

[16] In his claim concerning the Minimum Wage Law, Waithaka also cites Mass. Gen. Laws ch. 151, § 7, which delineates the commissioner's duties in establishing minimum fair wages.

Independent Contractor Misclassification Law claims on a class basis.  Id. ch. 149, §§ 148, 150.

Waithaka contends that these statutory provisions create a substantive right to bring class actions and that, in Massachusetts, the protection of that right reflects a fundamental public policy of the state.  To support that claim, Waithaka relies on Feeney v. Dell, Inc., 908 N.E.2d 753 (Mass. 2009) ("Feeney I"), and Machado v. System4 LLC, 989 N.E.2d 464 (Mass. 2013).  As we will explain, Feeney I considered a question similar to that raised by Waithaka's argument: whether the right to bring a consumer class action pursuant to another Massachusetts statute represented the fundamental public policy of the Commonwealth, and thereby precluded the contractual waiver of the right to bring such an action.  908 N.E.2d at 761-765.  Although the Massachusetts Supreme Judicial Court ("SJC") concluded that the Commonwealth's public policy did preclude such a waiver, id., the Supreme Court, interpreting the FAA in AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2001), forced a modification of that holding in a later Massachusetts case, see Feeney v. Dell, Inc., 989 N.E.2d 439, 440-41 (Mass. 2013) ("Feeney II").  Both Feeney I and Feeney II, the intervening Supreme Court decision in Concepcion, and Machado are all essential precedent on the conflict-of-law question presented here, and we therefore describe the reasoning of each case.

In Feeney I, the SJC concluded that the statutory right to pursue claims as a class provided by the Massachusetts consumer protection act represented the fundamental public policy of Massachusetts. 908 N.E.2d at 762. The SJC cited several reasons for that conclusion. First, the Massachusetts legislature "expressly provided for such [class action] mechanisms" in Section 9(2) of Chapter 93A. Id. The legislative history of that provision demonstrated a particular concern for the "aggregation of small consumer protection claims," which a consumer might otherwise be unwilling or unable to pursue as an individual claim. Id. at 762-63. Moreover, prohibiting class actions would "undermine[] the public interest in deterring wrongdoing" and would "negatively affect[] the rights of those unnamed class members on whose behalf the class action would proceed." Id. at 764.

Having concluded that Massachusetts public policy strongly favors class actions in the consumer context, the SJC considered whether it could invalidate a class waiver -- which was embedded within a mandatory arbitration clause governed by the FAA -- on those state public policy grounds without risking preemption by the FAA in this period prior to Concepcion. Id. at 768-69. Finding that the FAA presented no such barrier, see id. at 769, the SJC declined to enforce the class waiver, id. at 765. To rule otherwise, the SJC noted, "would in effect sanction a waiver of

the right" granted by Massachusetts consumer protection law to bring a class action in an arbitral or judicial forum. Id.

Soon thereafter, however, the Supreme Court decided Concepcion. Reviewing California's treatment of class action waivers in consumer contracts, the Court explained that the FAA limits a state's ability to invalidate class waiver provisions in arbitration clauses based on the state's public policy. 563 U.S. at 344-52.[17] Based on the reasoning and holding of Concepcion, the SJC concluded that it had misunderstood the FAA's preemptive effect on the Commonwealth's public policy. Accordingly, following Concepcion, the SJC revisited its Feeney I holding in Feeney II. See Feeney II, 989 N.E.2d at 441.

There, the SJC explained that it now understood that the FAA, as interpreted by Concepcion, "precludes the invalidation of class waiver provisions in arbitration clauses in consumer contracts . . . where the reason for invalidation is that such waivers are contrary to the fundamental public policy of the

_____

[17] Specifically, the Supreme Court decided in Concepcion whether the FAA "prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures." 563 U.S. at 336. It identified two scenarios in which state law would be preempted by the FAA: (1) where a state law "prohibits outright the arbitration of a particular type of claim," and (2) where a state law "doctrine normally thought to be generally applicable . . . is alleged to have been applied in a fashion that disfavors arbitration," and such an application "stand[s] as an obstacle to the accomplishment of the FAA's objectives." Id. at 341-43.

Commonwealth."  Id.  Moreover, "[b]ecause that was [the SJC's] primary reason in Feeney I for invalidating the class waiver provision in the arbitration agreement, Concepcion undoes the principal rationale for [its] decision in Feeney I."  Id.  In other words, the fact that a class waiver in a consumer contract violated a consumer's statutory right to bring class claims under Chapter 93A was no longer relevant in determining whether the waiver could be enforced if the waiver appeared in an arbitration clause governed by the FAA.

Nevertheless, the SJC identified in Feeney II one ground for invalidating a class waiver that survived Concepcion's ruling on the preemptive scope of the FAA: when a consumer demonstrates that she "effectively cannot pursue a claim against the defendant in individual arbitration according to the terms of the agreement, thus rendering . . . her claim nonremediable."  Id.  The SJC reasoned that Congress's intent in enacting the FAA

> was to preserve the availability of an
> arbitral forum and remedy for the resolution
> of disputes between parties to a commercial
> contract, and that it would be contrary to
> Congressional intent to interpret the FAA to
> permit arbitration clauses that effectively
> deny consumers any remedy for wrongs committed
> in violation of other Federal and State laws
> intended to protect them.

Id.

Under this new standard, a Massachusetts court had to determine whether a plaintiff had proven "as a matter of fact"

- 44 -

that the particular class waiver, in combination with the other terms of an arbitration agreement, made her claim nonremediable, effectively allowing an arbitration agreement to "confer[ on a defendant] . . . de facto immunity from private civil liability for violations of State law."  Id. at 462-63.  To assess whether a particular class waiver rendered claims nonremediable, a court could consider, among other things, the complexity of the claims asserted, the amount of damages sought, and the presence of fee-shifting provisions.  See id.[18]

On the same day the SJC issued Feeney II, the SJC issued Machado, which considered whether the reasoning articulated in Feeney I, applicable to class waivers in consumer contracts, as now modified by Feeney II, also applied to class action waivers in

---

[18] This proposition had a brief life.  Just eight days after the SJC issued Feeney II, the Supreme Court decided American Express Co. v. Italian Colors Restaurant, 570 U.S. 228 (2013). Although the Court was not directly reviewing Feeney II, the Court's ruling made clear that the ground on which the SJC believed it could still invalidate a class waiver without risking preemption by the FAA did not, in fact, survive Concepcion.  See Italian Colors, 570 U.S. at 238 (holding that a class waiver in an arbitration agreement is enforceable under the FAA even when a plaintiff shows that the waiver will prevent her from vindicating her statutory rights).  Thus, the SJC issued Feeney v. Dell, Inc., 993 N.E.2d 329 (Mass. 2013) ("Feeney III"), concluding that, "following [Italian Colors], our analysis in Feeney II no longer comports with the Supreme Court's interpretation of the FAA."  Id. at 330.  Nonetheless, both Feeney I and II remain important for understanding Machado.  The FAA is inapplicable to Waithaka's claims; thus, the SJC's abrogation of its holding in Feeney II based on FAA preemption does not alter the relevance of Feeney II to our understanding of Machado.

arbitration clauses of employment contracts, like the one in the Agreement here.  See Machado, 989 N.E.2d at 467.  The SJC noted that "many of the same public policy arguments [applicable to consumer claims under Chapter 93A] apply equally well to claims by employees under the Wage Act."  Id. at 470.  However, for the same reasons described in Feeney II, the SJC concluded that the FAA precluded a court from invalidating a class waiver in an employment contract based on such state public policy grounds.  Id. at 471.  Despite the "legitimate policy rationales" that led the Massachusetts legislature to create a statutory right to bring a class proceeding, codified in Section 150 of the Wage Act, the SJC concluded that those public policy concerns were "of no avail" after Concepcion.  Id. at 470.  As in the consumer claims context, when the FAA applied, the SJC could invalidate a class waiver in an employment contract only when the plaintiff could demonstrate that

> she lacks the practical means to pursue a claim in individual arbitration or, put differently, that the class waiver, when combined with the other terms of the arbitration agreement, "effectively denies [the plaintiff] a remedy and insulates the defendant from private civil liability for violations of State law."

Id. (alteration in original) (quoting Feeney II, 989 N.E.2d at 440).[19]

Ultimately, the SJC concluded that the plaintiffs in Machado were unable to make that factual showing. Because they were seeking damages of approximately $10,000, the SJC rejected their "contention that their claims were nonremediable in individual arbitration because the costs of arbitration would more than surpass any potential recovery that they might be entitled to." Id. at 472 (internal quotation marks omitted). In other words, the plaintiffs had not shown that their class waiver was invalid based on the narrow ground that the SJC thought survived Concepcion. Thus, the Machado plaintiffs were left to pursue their Massachusetts Wage Act claims in individual arbitration. Id.

Despite this outcome, Waithaka urges that the reasoning of Machado and Feeney I demonstrates that class waivers in employment contracts, like those in consumer contracts, are contrary to Massachusetts's fundamental public policy, as reflected in the three employment statutes under which Waithaka asserts his claims. Although that state policy cannot serve as a basis to invalidate a class waiver in an arbitration provision governed by the FAA, Waithaka asserts that the policy retains force when state law governs.

---

[19] Of course, after Feeney III, this exception recognized by the SJC was no longer available.

- 47 -

Amazon sees the Massachusetts precedent differently. It argues that Machado shows that "Massachusetts now confines workers' substantive right to class litigation to situations in which the plaintiff 'effectively cannot pursue [his or her] claim . . . in individual arbitration.'" Because Waithaka seeks damages greater than those at issue in Machado, Amazon argues, the class waiver provisions do not leave Waithaka without a viable means of pursuing relief and, therefore, even under Massachusetts law, these provisions are not unenforceable as contrary to the Commonwealth's public policy.

Amazon's reading of Machado disregards the way that Concepcion impacted the SJC's treatment of the class waiver at issue there. Amazon's proposed test for determining the enforceability of a class waiver -- whether a plaintiff can effectively pursue her claim in individual arbitration based on the amount of damages sought -- comes directly from Feeney II, see 989 N.E.2d at 441, in which the SJC identified an alternative basis for invalidating a class waiver in the context of a consumer claim after Concepcion held that state public policy cannot provide that basis when the FAA applies.

The SJC did not say in Feeney II or Machado that it had changed its view, expressed in Feeney I, that public policy concerns can invalidate a class waiver. Moreover, there is significant evidence in Machado that the SJC would conclude that

- 48 -

the right to pursue class relief in the employment context represents the fundamental public policy of the Commonwealth, such that this right cannot be contractually waived in an agreement not covered by the FAA. In addition to the policy rationales articulated for consumer claims in Feeney I, such as "the deterrent effect of class action lawsuits," the SJC highlighted another significant rationale unique to the employment context that supports this non-waiver conclusion. Machado, 989 N.E.2d at 470 n.12. As the SJC put it, the statutory right to pursue class relief reflects the Commonwealth's "desire to allow one or more courageous employees the ability to bring claims on behalf of other employees who are too intimidated by the threat of retaliation and termination to exercise their rights." See id.

Indeed, Massachusetts provides even greater statutory protection for the right to bring class claims in the employment context than in the consumer claims context. Massachusetts law specifically precludes the waiver of the right to bring class claims arising under the Wage Act and Independent Contractor Misclassification Law. Mass. Gen. Laws. Ch. 149, § 148.[20] Such "[a]nti[-]waiver provisions are characteristic of laws that

_____

[20] The fact that this anti-waiver provision does not extend to the Minimum Wage Law is not significant to our analysis. For the other reasons stated, the Minimum Wage Law's own allowance for class claims reflects the fundamental public policy of the Commonwealth.

protect fundamental public policy."  Melia v. Zenhire, Inc., 967

N.E.2d 580, 588 (Mass. 2012).

Several statements in Machado confirm that the SJC would

conclude that the Commonwealth's fundamental public policy

protects the right to bring class actions in the employment

context, and, furthermore, that it would have reached a contrary

conclusion in that case if the FAA had not preempted Massachusetts

law.  The SJC stated forthrightly that it was not "blind to the

fact that the Legislature may find its purposes [in creating a

statutory right to bring class claims] frustrated by [the] outcome"

in Machado.  989 N.E.2d at 470-71.  After invalidating and severing

another portion of the employment contract that directly

contradicted a different right provided by the Wage Act,[21] the SJC

stated that it likely would have done the same with the class

waiver if the FAA did not preclude it from doing so.  See id. at

_____

[21] The contract included a waiver of multiple damages. Machado, 989 N.E.2d at 472.  However, "because the award of treble damages is mandatory under [the Wage Act], and cannot be waived," the SJC invalidated and severed that portion of the contract.  Id. at 472-73.  The Court explained that it was able to enforce the Wage Act's mandatory award of treble damages and anti-waiver provision that protected that entitlement because doing so "does not impinge on any fundamental characteristic of arbitration, nor does it frustrate the purpose of the arbitral forum."  Id. at 473. Therefore, the FAA did not preempt the SJC's decision to invalidate and sever that portion of the arbitration agreement as contrary to the Commonwealth's fundamental public policy.  Id.  However, because invalidating the class waiver provision would fundamentally alter the nature of the arbitration proceedings, the SJC could not similarly invalidate and sever the class waiver provision without running afoul of the FAA.  Id.

472-73. Specifically, the SJC said that "[p]rior to Concepcion, the provision for class proceedings in § 150 [of the Wage Act] and the [provision that prevents contractual waiver of that right] likely would have compelled [the SJC] to invalidate and sever the class waiver." Id. at 473.

Thus, based on the SJC's reasoning in Machado, we are confident that the SJC would conclude that, like the statutory right to proceed as a class in the context of Massachusetts Chapter 93A consumer claims, the statutory rights to proceed as a class articulated in the Massachusetts Wage Act, Independent Contractor Misclassification Law, and Minimum Wage Law -- as well as the statutory provision that precludes contractual waiver of these rights -- represent the fundamental public policy of Massachusetts, and that the SJC would therefore invalidate a class waiver in an employment contract, like that of Waithaka, not covered by the FAA. See Mass. Gen. Laws ch. 149, §§ 148, 150 & ch. 151, § 20. Notwithstanding the Supreme Court's view that such state policies must give way when the FAA governs a dispute, the policies remain intact where, as here, the FAA does not preempt state law. See Machado, 989 N.E.2d at 470-71, 473.[22]

_____

[22] Amazon argues that Massachusetts interprets its own Arbitration Act, Mass. Gen. Laws ch. 251, § 1, identically to the FAA, and so, in light of Concepcion and Italian Colors, even if Massachusetts law applied, any public policy against class waivers would give way to Massachusetts's own pro-arbitration policy. See

## 2. The Competing Laws

Because the Agreement's class waiver provisions would be invalid under Massachusetts law, we must assess whether Massachusetts law would oust the contractual choice of Washington law, see supra Section III.A, -- based on our assumption for purposes of this case that Washington law would permit the class waiver provisions to be enforced -- and thereby preclude arbitration from being compelled pursuant to state law. See Feeney I, 908 N.E.2d at 766 (engaging in conflict-of-law analysis to determine whether consumer contract's choice of Texas law was unenforceable as contrary to Massachusetts's fundamental public policy). Massachusetts has embraced the conflict-of-law principles in the Restatement (Second) of Conflict of Laws.[23] See

_____

Miller v. Cotter, 863 N.E.2d 537, 543 (Mass. 2007) (commenting that the FAA's "language is remarkably similar to" the Massachusetts Arbitration Act); Walker v. Collyer, 9 N.E.3d 854, 859 (Mass. App. Ct. 2014) (explaining that, in deciphering the Massachusetts Arbitration Act, courts "give strong weight to . . . decisions applying the Federal Arbitration Act"). But even if Massachusetts follows the lead of the FAA in interpreting its own Arbitration Act, that does not help us determine how it balances competing policy rationales in the absence of federal preemption. Neither Miller nor Walker has anything to say on that balancing, and Amazon does not point us to any other cases that do. We therefore reject the argument that Massachusetts's public policy favoring the ability to bring classwide claims gives way to its own pro-arbitration policy.

[23] Federal courts sitting in diversity look to the conflict-of-law principles of the forum state to determine the applicable substantive law. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Neither party has contested that Massachusetts remains the "forum state" for purposes of the

Hodas v. Morin, 814 N.E.2d 320, 324 (Mass. 2004). The Restatement establishes a two-part inquiry: first, we must assess whether the state chosen by the parties in their contract has a "substantial relationship" to the contract and, second, whether applying the law of that state -- here, Washington -- **"'would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state' and is the state whose law would apply . . . 'in the absence of an effective choice of law by the parties.'"** Id. at 325 (quoting Restatement (Second) of Conflict of Laws § 187(2) (Am. Law Inst. 1971)).

Washington, where both Amazon.com and Amazon Logistics are headquartered, has a "substantial relationship" to the contract. See Restatement (Second) of Conflict of Laws § 187(2) cmt. f (Am. Law Inst. 1971) (noting that a state has a "substantial relationship" to the contract if it is "where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business"). Yet Amazon does not dispute that, in the absence of an effective contractual choice of law, the law of Massachusetts would apply. Nor does Amazon contest that Massachusetts, where Waithaka has indisputably

conflict-of-law analysis despite the transfer under the "first-to-file" doctrine to the Western District of Washington. Cf. Ferens v. John Deere Co., 494 U.S. 516, 523-27 (1990) (explaining that, when the transfer of a diversity case occurs under 28 U.S.C. § 1404(a), the state law of the transferor jurisdiction applies even after the transfer).

performed all of his work pursuant to the contract, has "a materially greater interest" in the enforceability of the class waiver and arbitration provisions than Washington. Moreover, engaging in a conflict-of-law analysis in Feeney I, the SJC had little trouble finding that, in a dispute where the Commonwealth's fundamental interest in avoiding class waivers was at stake, the Commonwealth had a "materially greater interest" than the state whose law would otherwise apply. See Feeney I, 908 N.E.2d at 766-67 & n.32 (noting that the question of whether Massachusetts has a "materially greater interest" in a contractual relationship "is subsumed with [the plaintiffs'] argument that the fundamental public policy favoring class actions" would result in the application of Massachusetts law) (internal quotation marks omitted). Ultimately, Amazon contests only whether the fundamental public policy of Massachusetts barring class waivers in employment contracts applies when a worker seeks damages of a sufficiently high dollar value. But we have already explained why Amazon's contention fails.

Hence, assuming that Washington law would permit the class waiver provisions, Massachusetts law would oust the contractual choice of Washington law as contrary to the Commonwealth's fundamental public policy and would govern the enforceability of the dispute resolution section of the Agreement. Under Massachusetts law, the class waiver provisions would be

invalid.  Because, as noted, <u>see</u> <u>supra</u> Section III.B, the Agreement stipulates that the class waiver provisions cannot be severed from the rest of the dispute resolution section, the arbitration provision would be similarly unenforceable.[24]

Thus, the district court rightly refused to compel arbitration pursuant to state law.

**IV.**

For the foregoing reasons, we <u>affirm</u> the district court's denial of Amazon's motion to compel arbitration.

<u>So ordered.</u>

---

[24] As we stated already, if our assumption for purposes of our conflict-of-law analysis that Washington would permit class action waivers in employment contracts is incorrect, and thus there is no actual conflict between the law of Washington and Massachusetts, Waithaka would simply prevail under the contractual choice of Washington law.