In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-3226

LATRICE SAXON,

*Plaintiff-Appellant,*

*v.*

SOUTHWEST AIRLINES CO.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cv-0403 — **Robert M. Dow, Jr.**, *Judge.*

_____

ARGUED MARCH 3, 2021 — DECIDED MARCH 31, 2021

_____

Before MANION, WOOD, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* The Federal Arbitration Act has, since 1925, established a federal policy favoring arbitration. But every policy has its limits. One of the limits Congress placed on the Arbitration Act is an exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court and the *ejusdem generis* canon of statutory construction tell us that the last category refers

not to all contracts of employment, but only those belonging to "transportation workers." Beyond the two examples the statute provides—seamen and railroad employees—deciding who qualifies as a transportation worker is not always an easy task.

Latrice Saxon is a ramp supervisor who manages and assists workers loading and unloading airplane cargo for Southwest Airlines Company. After she brought a lawsuit against her employer, Southwest invoked the Arbitration Act. Saxon asserted that she was an exempt transportation worker, but the district court found her work too removed from interstate commerce and dismissed the case.

We reverse. The act of loading cargo onto a vehicle to be transported interstate is itself commerce, as that term was understood at the time of the Arbitration Act's enactment in 1925. Airplane cargo loaders, as a class, are engaged in that commerce, in much the way that seamen and railroad employees were, and Saxon and the ramp supervisors are members of that class. It therefore follows that they are transportation workers whose contracts of employment are exempted from the Arbitration Act.

**I**

As a ramp supervisor at Chicago Midway International Airport, Saxon supervises, trains, and assists a team of ramp agents—Southwest employees who physically load and unload planes with passenger and commercial cargo. Ostensibly her job is meant to be purely supervisory, but Saxon's uncontroverted declaration asserts that she and the other ramp supervisors at Midway frequently fill in as ramp agents when they are short on workers. Though the ramp agents are

covered by a collective bargaining agreement, supervisors like Saxon are excluded. She, like other excluded Southwest employees, agreed annually as part of her contract of employment—not separately—to arbitrate wage disputes.

Believing that Southwest failed to pay ramp supervisors for overtime work, Saxon nevertheless filed a putative collective action against Southwest under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219. Southwest moved to stay the suit pending arbitration, see 9 U.S.C. § 3, or to dismiss it for improper venue in light of Saxon's arbitration agreement, Fed. R. Civ. P. 12(b)(3); *Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005). Saxon responded that the Arbitration Act did not apply because she was a member of a "class of workers engaged in foreign or interstate commerce," and therefore exempted by § 1 of the Arbitration Act.

In *Circuit City Stores v. Adams*, 532 U.S. 105, 119 (2001), the Supreme Court held that the exemption in § 1 applies only to "transportation workers." Relying on *Lenz v. Yellow Transportation, Inc.*, 431 F.3d 348, 352 (8th Cir. 2005), Saxon maintained that she was a transportation worker because Southwest was a transportation company, and she was responsible for loading and unloading goods for transportation. Southwest replied that Saxon fell outside the exemption because she did not personally move goods across state lines or manage those who do.

The district court agreed with Southwest. Surveying the limited caselaw, the court determined that the "linchpin" of the transportation-worker definition was "actual transportation, not merely handling goods …. at one end or the other" of a network. In support, it highlighted the exclusion for seamen—a term which it understood not to cover the

longshoreman who loaded and unloaded ships—and extended that logic to warehousemen, stevedores, porters, and to Saxon's analogous role as a ramp supervisor. Saxon appealed.

## II

We recently considered the framework of the Arbitration Act and the § 1 exemption in *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798 (7th Cir. 2020). Congress passed the Act in 1925 in response to the general "hostility of American courts to the enforcement of arbitration agreements" and "sought to replace that 'widespread judicial hostility' with a 'liberal federal policy favoring arbitration.'" *Id.* at 799–800 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). Section 1 of the Act represents an outer limit on Congress's favor toward arbitration. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019). It provides that "nothing" in the Act shall apply to "contracts of employment" for "seamen," "railroad employees," and a third, residual category, "any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; *Wallace*, 970 F.3d at 799.

The parties do not dispute that Saxon's arbitration agreement is a contract of employment but only whether Saxon is one of the workers exempted. Like the plaintiff in *Wallace*, Saxon does not claim to be a seaman or railroad employee and argues only that she fits in the residual category.

To understand the scope of that category, we explained in *Wallace*, "our inquiry 'begins with the text.'" 970 F.3d at 800 (citing *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016)). We interpret the words of that text based on their "ordinary … meaning … at the time Congress enacted the statute." *New Prime*, 139 S.

Ct. at 539 (quoting *Wis. Cent. Ltd v. United States*, 138 S. Ct. 2067, 2074 (2018)).

The first textual clue is the phrase "class of workers," which obligates us to focus on the broader occupation, not the individual worker. *Wallace*, 970 F.3d at 800. We therefore ask not whether Saxon is engaged in commerce, but whether a given class of workers is engaged in commerce and whether Saxon is a member of that class. *Id.* at 802.

The second clue is the two enumerated categories of seamen and railroad employees, which provide a gloss on what it means for a class of workers to be "engaged in commerce." *Id.* at 801. Standing alone, the phrase "engaged in commerce" is a term of art with a narrower scope than similar formulations like "involving commerce" or "affecting commerce," though its precise breadth often depends on "statutory context." *Circuit City*, 532 U.S. at 115–18. Under the *ejusdem generis* canon of construction, general words are interpreted to reflect the "common characteristics" of the enumerated categories that precede them. *Ctr. Video Indus. Co. v. Roadway Package Sys., Inc.*, 90 F.3d 185, 187–88 (7th Cir. 1996); *see* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012). In *Circuit City*, the Supreme Court used this canon to reject the argument that § 1 exempted all employment contracts. 542 U.S. at 114–15. Instead, the court limited the scope of the residual category to "transportation workers," *id.* at 119, those who are "akin to 'seamen' and 'railroad employees,'" *Wallace*, 970 F.3d at 801. To be engaged in commerce for purposes of § 1, then, is to "perform[] work analogous to that of seamen and railroad employees, whose occupations are centered on the transport of goods in interstate and foreign commerce." *Id.* at 802.

### III

Saxon argues on appeal that ramp supervisors, and cargo loaders more broadly, are transportation workers within the original meaning of § 1 at the time it was enacted in 1925. Almost a century ago, she insists, those who loaded cargo for interstate transport were recognized to be engaged in commerce. She also draws parallels between her job loading cargo as a ramp supervisor and the 1925 definitions of seamen and railroad employees, which in her view covered boat and train cargo loaders.

### A

Southwest first raises a threshold objection to Saxon's argument: she never made it in the district court. She urged the district court only to follow the Eighth Circuit's *Lenz* decision, which did not emphasize the text of § 1, its original meaning in 1925, or the scope of the two enumerated categories. Southwest contends that Saxon therefore forfeited or waived her arguments, though Saxon insists she generally raised the relevant issues in the district court.

We need not resolve this dispute. Even if Saxon had waived her arguments by failing to present them in the district court, we would still consider them now. We may, in our discretion, forgive waiver or forfeiture in a case that presents a pure question of statutory interpretation that the parties have fully briefed on appeal. *E.g.*, *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351 (7th Cir. 2017) (en banc); *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749–50 (7th Cir. 1993). We exercise such discretion sparingly, *see In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015), but we would elect to do so here. Saxon presents us with an important and

recurring question of statutory interpretation, and the district court itself correctly noted the lack of guiding authority. We think it better to add what clarity we can than to defer our consideration of these significant issues to a later date.

**B**

On appeal, the parties agree that Southwest's business of flying passengers and their baggage (and, to a lesser extent, freight cargo) is in interstate or foreign commerce within the meaning of § 1. Southwest disputed this point in the district court and argued that to be in commerce meant only transport of *goods*—not primarily people and their effects—but it abandoned that theory on appeal. We have no reason to dispute its concession and accept that the movement of goods accompanying people, just as much as the movement of goods alone, is in interstate commerce. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 226 (3d Cir. 2019).

That Southwest is engaged in commerce does not resolve this case. Saxon contends otherwise in her broadest argument, suggesting that the proper class of workers parallel to seamen and railroad employees is "airline employees." She defines that group simply enough: those employed by an airline, a class of which she is obviously a part.

Although this view draws a bright and clear line, it is inconsistent with the text of the residual exemption. The phrase "any other class of workers engaged in foreign or interstate commerce" asks that the class of workers, not their employer, be engaged in commerce. This feature cuts both ways. On the one hand, a transportation worker need not work for a transportation company. *Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 957 (7th Cir. 2012). But

on the other hand, a person does not become a transportation worker just by working for a transportation company. *See Lenz*, 431 F.3d at 351; *Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1284 (11th Cir. 2001), *vacated* 294 F.3d 1275 (11th Cir. 2002) (joint stipulation to dismiss); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1469, 1472 (D.C. Cir. 1997). The employer's business might well inform the "ultimate inquiry" whether its employees are engaged in commerce, *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 917 (9th Cir. 2020); *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 22–23 (1st Cir. 2020), but the employer is not itself the inquiry. Ramp supervisors are not transportation workers just because they work for Southwest.

Instead, to be exempted under the residual clause of § 1, the ramp supervisors must themselves be engaged in interstate or foreign commerce. To resolve that question we ask "whether the interstate movement of goods is a central part of the class members' job description," meaning that the workers are actively occupied in "the enterprise of moving goods across interstate lines." *Wallace*, 970 F.3d at 801–02. This line is not as easy to draw.

Wherever the line may be, though, ramp supervisors fall on the transportation-worker side of it. A central part of their job is the loading and unloading of cargo for planes on interstate and international flights. Although this is officially the role of the ramp *agents*, not the supervisors, Saxon estimates that she and her peers each cover three full ramp-agent shifts per week. Southwest offered no evidence to contradict this estimate. We need not consider, then, whether supervision of cargo loading alone would suffice. Ramp supervisors and ramp agents alike spend a significant amount of their time engaged in physically loading baggage and cargo onto planes

destined for, or returning from, other states and countries, and that cargo-loading work is interstate or foreign commerce.

Southwest argues, and the district court concluded, that loading and unloading cargo is not enough to make a worker engaged in commerce because that phrase refers only to "actual transportation." The premise is correct. "[T]ransportation workers are those who are 'actually engaged in the movement of goods in interstate commerce.'" *Id.* at 801 (citing *Kienstra Precast*, 702 F.3d at 956). We differ, however, in the conclusion. Actual transportation is not limited to the precise moment either goods or the people accompanying them cross state lines. Loading and unloading cargo onto a vehicle so that it may be moved interstate, too, is actual transportation, and those who performed that work were recognized in 1925 to be engaged in commerce. Indeed, one year earlier, the Supreme Court held it was "too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it" and thus a person injured while unloading cargo from a train was employed in commerce. *Balt. & Ohio Sw. R.R. v. Burtch*, 263 U.S. 540, 544 (1924).

The same logic extended to stevedores and longshoremen, the dockworkers who loaded and unloaded ships at port. The Supreme Court in 1928 deemed "[t]he unloading of a ship" to have "direct relation to commerce and navigation," such that a stevedore was within federal maritime jurisdiction. *N. Coal & Dock Co. v. Strand*, 278 U.S. 142, 144 (1928). A decade later the Court reiterated this point in stronger terms: "*No one would deny that the crew would be engaged in interstate or foreign commerce if busied in loading or unloading an*

interstate or foreign vessel." *Puget Sound Stevedoring Co. v. State Tax Comm'n*, 302 U.S. 90, 92 (1937) (emphasis added). The Court recognized that the work the crew was engaged in—loading and unloading a vessel—was itself interstate or foreign commerce. *Id.* at 94; *see also Joseph v. Carter & Weekes Stevedoring Co.*, 330 U.S. 422, 427 (1947) ("The transportation in commerce, at the least, begins with loading and ends with unloading."). A cargo loader may not herself cross the state border, but without her work, neither would the goods in her care. She is an essential part of the enterprise of transporting goods between states and countries.

Southwest points out that the Supreme Court overruled these stevedoring cases in *Department of Revenue v. Association of Washington Stevedoring Companies*, 435 U.S. 734 (1978). The Court did not, however, abrogate its holdings that stevedores were engaged in commerce, let alone imply the cases were wrong when decided. Originally, because stevedoring was commerce, the Court held it was *per se* unconstitutional for states to tax that work. *Puget Sound*, 302 U.S. at 94. Forty years later the Court eliminated this *per se* prohibition of taxation. *Ass'n of Wash. Stevedoring Cos.*, 435 U.S. at 748–50. It reaffirmed, however, that stevedoring was commerce, and, the court presumed, commerce in the sense of "movement" and "transport," as distinct from "commerce that does not move goods." *Id.* at 748.

We are thus left with the firm conviction that cargo loaders generally are a class of workers engaged in the actual transportation of goods. Ramp supervisors who also load and unload cargo in the manner Saxon attests, in turn, are airplane cargo loaders and members of that class, and thus engaged in commerce for purposes of § 1.

## C

A comparison to the enumerated categories of seamen and railroad employees in § 1 further supports our conclusion that a ramp supervisor falls within the residual clause and is a transportation worker like them.

## 1

Regarding seamen, we again agree with the district court and Southwest's premise, but not their conclusion. The term "seaman" is a term of art that excludes the stevedores, longshoremen, and land-based dockworkers to whom we just compared ramp supervisors. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342, 348 (1991). The distinction is quite literal thanks to a quirk from 1927: "seaman" is statutorily defined by its exclusion from the Longshoremen's and Harbor Workers' Compensation Act, Pub. L. No. 69-803, 44 Stat. 1424 (1927) (codified as amended at 33 U.S.C. §§ 901–950). *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 355–56, 358–59 (1995).

Saxon argues that seamen meant something different two years earlier, in 1925, and then included dockworkers. This is partially correct. *International Stevedoring Co. v. Haverty*, 272 U.S. 50, 52 (1926), did hold that a stevedore was a seaman for purposes of the Jones Act, Pub. L. No. 66-261 § 31, 41 Stat. 988, 1006 (1920) (codified as amended at 46 U.S.C. §§ 30101–30106), which provides a claim in negligence for injured seamen. The Compensation Act abrogated that holding, but even at the time *Haverty*'s reasoning applied *only* to the Jones Act. The Court acknowledged that "for most purposes, as the word is commonly used, stevedores are not 'seamen.'" *Haverty*, 272 U.S. at 52. Because stevedores and seamen performed similar tasks, the Court inferred that Congress wanted

them to receive the same protections, regardless of job title. *Id.*; *see also Uravic v. F. Jarka Co.*, 282 U.S. 234, 239 (1931) (explaining that *Haverty* did not "say or mean that stevedores are to be regarded as seamen" only that they are "given the rights of seamen"). There was and remains a "fundamental distinction" between seamen and land-based workers. *See Chandris*, 515 U.S. at 358.

A distinction, even a fundamental one, does not necessarily mean a difference. Saxon does not purport to be a seaman but to perform work sufficiently analogous to seamen to infer she is engaged in commerce like them. Southwest gives us no reason to believe the distinction between seamen and longshoremen rests on their relation to commerce. Instead, it is typically justified by the unique hazards that seamen face on the open seas. *See Chandris*, 515 U.S. at 354–55. So *Haverty*'s extension of the seaman's protections to stevedores was questionable, but its broader point remains valid. Seamen, stevedores, and longshoremen performed similar—even if not identical—work. Other cases contemporary to the Arbitration Act also carried this theme and recognized that the crew of the ship had historically performed the specialized work of the stevedore and longshoreman. *See Puget Sound*, 302 U.S. at 92; *Atlantic Transp. Co. of W. Va. v. Imbrovek*, 234 U.S. 52, 62 (1914). Given this similarity in their work we see no reason to infer that Congress's express inclusion of seamen in § 1 leads to an implied exclusion of longshoremen or other cargo loaders like them. They are all workers engaged in interstate or foreign commerce, even if they are not the same class.

Southwest urges us to follow the Fifth Circuit, which, in *Eastus v. ISS Facility Services, Inc.*, 960 F.3d 207 (5th Cir. 2020), noted the parties' agreement that longshoremen were not an

exempted class of workers. *Id.* at 211–12. The appellant, Heidi Eastus, supervised and assisted airport ticketing and gate agents who placed passengers' baggage on conveyor belts to be screened and loaded. *Id.* at 208. Because her work could "at most be construed as loading and unloading airplanes," she resembled more a longshoreman than a seaman, so the court held she was also not exempt. *Id.* at 212.

Saxon does not make the same concession as in *Eastus*, and without that starting point, we do not think its logic directly applies here. *Eastus* addressed little of the history that we have covered. Instead, its analysis rested on a decision interpreting the term "seaman" under § 1 and expressly disclaiming reliance on the residual clause. *See Brown v. Nabors Offshore Corp.*, 339 F.3d 391, 394 (5th Cir. 2003). Longshoremen may not belong to the enumerated class of seamen, but it cannot follow that one is not a transportation worker just because she is not a seaman. The residual clause must have some content beyond just the enumerated categories, lest we read it out of the statute entirely. Excluding all cargo loaders also conflicts with the Third Circuit's established interpretation of § 1 through railroad law, as we explore further below. We express no opinion on whether Eastus herself was a transportation worker—she did not personally load and unload cargo, and so was at least one step removed from either longshoremen or ramp supervisors like Saxon.

**2**

Even if a gap existed in the analogy between seamen and cargo loaders, we still must compare ramp supervisors to the other enumerated category, railroad employees. One complicating matter is that, unlike seaman, "railroad employee" is not a term of art with any settled meaning. The Supreme

Court has noted only that the term "may have swept more broadly at the time of the Act's passage than might seem obvious today." *New Prime*, 139 S. Ct. at 543.

In the absence of other guidance, Saxon proposes the term should be understood by its plain meaning—those employed by a railroad, obviously including porters and other train cargo loaders. She also supports a broad construction by pointing to the Transportation Act of 1920, tit. III, Pub. L. No. 66-152, 41 Stat. 456, 469 (repealed 1926), which established a Railroad Labor Board to resolve disputes between railroads and their employees, including train cargo loaders but also clerks and janitors only tangentially related to transportation. *E.g., Bhd. of Ry. & S.S. Clerks v. Erie R.R.*, Decision No. 1210, 3 R.L.B. 667, 667 (1922); *see also Ry. Emps.' Dept. v. Ind. Harbor Belt R.R.*, Decision No. 982, 3 R.L.B. 332, 337 (1922) (defining "employee" broadly to mean "those engaged in the customary work directly contributory to the operation of the railroads"). These possibilities, however, too closely resemble the employer-based reasoning that we have already said is incompatible with the residual clause, and so have limited utility in interpreting that clause, whatever merit they may have for the enumerated category of railroad employees.

We need not rest on these broad definitions, though, because cargo loaders fit within a narrower class of railroad employees defined by their relation to commerce. The Federal Employers' Liability Act (FELA), Pub. L. No. 60-100, § 2, 35 Stat. 65 (1908) (codified as amended at 45 U.S.C. §§ 51–60), allowed railroad workers injured while "employed … in … commerce" to sue the railroad for negligence. Considering the substantial overlap between this formulation and § 1 of the Arbitration Act, the Third Circuit—applying the same *ejusdem*

*generis* reasoning that the Supreme Court later adopted in *Circuit City*—first relied on FELA caselaw to inform its interpretation of § 1 decades ago. *See Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., Local 437*, 207 F.2d 450, 452–53 (3d Cir. 1953) (en banc).

The FELA cases identify at least two general categories of workers employed in interstate commerce, beyond the obvious worker who physically crosses state lines. The first category included those who worked on an intrastate leg of an interstate journey. *See, e.g.*, *Phila. & Reading Ry. v. Hancock*, 253 U.S. 284, 285–86 (1920). The First and Ninth Circuits recently relied on this line of cases to conclude that so-called "last mile" delivery drivers fit within the § 1 exemption. *See Rittmann*, 971 F.3d at 912; *Waithaka*, 966 F.3d at 20–21. Ramp supervisors and cargo loaders do not resemble this category, so we have no need to decide whether we agree with that position today.

Cargo loaders fit cleanly into the second category—those whose work was "so closely related to [interstate transportation] as to be practically a part of it." *Shanks v. Del., Lackawanna & W.R.R.*, 239 U.S. 556, 558 (1916). As we have already noted, the Court held in 1924 that it was "too plain to require discussion that the loading or unloading of an interstate shipment" sufficed for a worker to fit within this category. *Burtch*, 263 U.S. at 544. Although the First Circuit has expressly reserved the question, *Waithaka*, 966 F.3d at 20 n.9, 22 n.10, the Third Circuit has consistently held that workers are exempt under § 1 if they are so closely related to transportation as to be part of it. *See Singh*, 939 F.3d at 226; *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593 (3d Cir. 2004); *Tenney Eng'g*, 207 F.2d at 453.

Southwest does not dispute that train cargo loaders were "employed in commerce" for FELA purposes in 1925. It protests only that we should not rely on FELA to interpret the Arbitration Act. FELA is construed liberally to effect a remedial purpose, it insists, but the Arbitration Act has no remedial purpose. Its purpose is to favor arbitration. Otherwise, Southwest fears a slippery slope—excluding ramp supervisors could eventually lead to excluding ticket and gate agents, security guards, taxi drivers, and airport vendors all on the ground that each supports the work of the airline.

We find neither of these objections compelling. Southwest has given us no reason to believe that FELA's remedial purpose influenced the extension of its protections to cargo loaders. *See Rittmann*, 971 F.3d at 912 n.2 (same for workers on intrastate portions of interstate journeys); *Waithaka*, 966 F.3d at 22 (same). The Supreme Court in *Burtch* did not just say cargo loaders were employed in commerce but that it was "too plain to require discussion" that they "fully satisfy" that test. 263 U.S. at 544. To exclude all cargo loaders, then, we would have to abandon any comparison to FELA whatsoever—without an alternative, narrower proposal from Southwest by which to compare unenumerated workers to railroad employees—and put ourselves in conflict with the Third Circuit's approach and in tension with the First and Ninth Circuits' interpretation of § 1. Cargo loaders are a relatively easy question under FELA, so we do not see a need, in this case, to go as far as the Ninth Circuit and hold that FELA's remedial purpose affected only its definition of negligence. *Rittman*, 971 F.3d at 912 n.2. Nor do we foreclose the possibility that some workers who were "employed in commerce" for FELA purposes in 1925 are not "engaged in commerce" for purposes of

the Arbitration Act. If those workers exist, they were not cargo loaders.

For similar reasons, we do not see this as the start of a slippery slope. For one, much of Southwest's fear rests on FELA decisions after 1939, when Congress loosened the "employed in commerce" test. *See S. Pac. Co. v. Gileo*, 351 U.S. 493, 498–99 (1956). Later decisions thus shed little light on what it meant to be engaged in commerce in 1925. In any event, Southwest does not suggest transportation workers are limited to those who physically cross state lines and we do not think such a limitation could be supported. The loading of goods into a vehicle traveling to another state or country is the step that both immediately and necessarily precedes the moment the vehicle and goods cross the border. To say that this closely related work *is* interstate transportation does not necessarily mean that the work of a ticketing or gate agents (like in *Eastus*) or others even further removed from that moment qualify too. We say this not to prejudge future cases, but only to reiterate that a transportation worker "must be connected not simply to the goods, but to the act of moving those goods across state or national borders." *Wallace*, 970 F.3d at 802. Whether the goods have been or ultimately will go to another state or country is not important except to the extent the class of workers directly progresses them on that journey. Airplane cargo loaders like Saxon are essential to that progress in a way distinct even from other airline employees.

### 3

The foregoing analysis rests on the premise that the common characteristics of seamen and railroad employees, for *ejusdem generis* purposes, is their relationship with interstate or foreign commerce. Southwest offers a different view. It

asserts that the link between seamen and railroad employees is that both were subject to alternative dispute-resolution schemes in 1925. The purpose of the § 1 exemption in the Arbitration Act, it contends, was to avoid conflict with such schemes, including the Railway Labor Act. *See Circuit City*, 552 U.S. at 120–21 (calling this purpose a "permissible inference"). Because Saxon, as a supervisor, is not covered by the Railway Labor Act (and certainly would not have been in 1925, a year before it existed and a decade before it extended to airline workers), Southwest contends that she cannot be exempt from the Arbitration Act.

The critical flaw with this argument is that the text of § 1 does not tie exemption to any other law. The text directs us to ask whether the class of workers is engaged in commerce. Even if Southwest correctly identifies the purpose of § 1, "[p]urpose cannot override text." *Waithaka*, 966 F.3d at 25 (citing *New Prime*, 139 S. Ct. at 543). If Congress intended to exempt only workers covered by dispute-resolution schemes in 1925, it could have enumerated them and skipped the residual exemption entirely. *See id.*

The consequences of excluding Saxon despite the absence of some other federal arbitration scheme are not nearly as dire as Southwest predicts. It insists that our holding will create a subset of workers "completely unable to agree to arbitration." But Saxon could still face arbitration under state law or through an agreement outside of her contract of employment. All we decide today is that the Federal Arbitration Act's policy favoring arbitration does not extend to Saxon's contract of employment under the plain text of § 1. The exemption in 9 U.S.C. § 1 reflects a limit Congress placed on its otherwise liberal favor toward arbitration, and we are obligated to respect

that limit before enforcing the Arbitration Act. *New Prime*, 139 S. Ct. at 543.

## IV

Because we conclude that airplane cargo loaders are a class of workers engaged in commerce and Saxon is a member of that class, it follows that she is a transportation worker whose contract of employment is exempt from the Federal Arbitration Act. We therefore reverse the district court's judgment compelling arbitration and remand for further proceedings.