# United States Court of Appeals
## For the First Circuit

No. 22-1268

MARGARITO V. CANALES; BENJAMIN J. BARDZIK,

Plaintiffs, Appellees,

v.

CK SALES CO., LLC; LEPAGE BAKERIES; FLOWERS FOODS, INC.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Kayatta, Lynch, and Thompson,
Circuit Judges.

Amanda K. Rice, with whom Traci L. Lovitt, Matthew W. Lampe, Jack L. Millman, Jones Day, Peter Bennett, Frederick B. Finberg, Pawel Z. Binczyk, and The Bennett Law Firm, P.A., were on brief, for appellants.
Archis A. Parasharami, Mayer Brown LLP, Jennifer B. Dickey, Jonathan D. Urick, and U.S. Chamber Litigation Center, Inc., on brief for Chamber of Commerce of the United States of America, amicus curiae.
Benjamin C. Rudolf, with whom Sarah H. Varney and Murphy & Rudolf, LLP, were on brief, for appellees.

May 5, 2023

**KAYATTA**, **Circuit Judge**. This is the latest in a line of cases calling for interpretation of section 1 of the Federal Arbitration Act ("FAA"). Section 1 exempts from the FAA's purview "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Considering the arguments and evidence before it, the district court denied defendants' motion to dismiss or, in the alternative, to compel arbitration under the FAA. In so doing, the district court found that plaintiffs, who distribute baked goods along routes in Massachusetts, fit within the section 1 exemption. Defendants, whose baked goods plaintiffs distribute, request reversal on several grounds, some of which they presented to the district court and others of which they did not. Addressing only those arguments raised below, we affirm. Our reasoning follows.

## I.

Defendant Flowers Foods, Inc. ("Flowers"), is a Georgia-based holding company of various subsidiary bakeries, including defendant Lepage Bakeries Park Street, LLC ("Lepage"), which operates out of Auburn, Maine. Lepage uses a "direct-store-delivery" system to get its products on the shelves of grocery stores and other businesses that sell baked goods to consumers. Through its wholly owned subsidiary, defendant CK Sales Co., LLC ("CK Sales"), Lepage sells distribution rights to so-called

- 3 -

"independent distributors." These distributors purchase rights to distribute Lepage's baked goods along particular routes. They buy the baked goods from defendants and then resell and deliver the goods to stores along their routes. Defendants classify these distributors as independent contractors.

Prior to April 2018, plaintiffs Margarito Canales and Benjamin Bardzik worked as employees delivering defendants' baked goods through a temporary staffing agency. In late 2017, defendants told plaintiffs that their delivery route would be purchased soon, which plaintiffs took to mean that they would be terminated unless they purchased the route themselves. Plaintiffs created a distribution company, T & B Dough Boys Inc. ("T&B"), of which Canales owns fifty-one percent and Bardzik owns forty-nine percent. Through T&B, plaintiffs purchased distribution rights for three Massachusetts routes in June 2018. They purchased a fourth route in July 2019, which they later sold back to buy a different route in October 2020. Each time T&B purchased a route, it entered a "Distributor Agreement" with CK Sales.

Each of plaintiffs' routes is entirely within Massachusetts. To get the baked goods to Massachusetts, defendants ship them across state lines to a warehouse in North Reading, Massachusetts. Pursuant to the Distributor Agreements, title and risk of loss of the goods pass to T&B upon delivery. At some later point, plaintiffs pick up the baked goods from the warehouse and

deliver them in trucks to stores along their routes. Plaintiffs' sworn affidavits state that they each spend a minimum of fifty hours per week driving delivery routes, and another twenty to thirty hours per week supervising other drivers. Other than these facts, the record reveals little about how the goods are ordered to the warehouse or exactly how they are distributed from there.

The parties dispute how much control defendants exercise over plaintiffs' business under the Distributor Agreements and in practice. Defendants describe the distribution relationship as one in which plaintiffs, through T&B, purchase baked goods from defendants and resell them to stores for a profit, using their business judgment to increase the value of their routes by, e.g., soliciting new customers, growing sales, and merchandising effectively. Defendants point to business plans submitted by plaintiffs as evidence of plaintiffs' use of discretion and business judgment to grow their company. Plaintiffs see things differently and contend that, "[b]oth by the terms of the written contracts and in practice, [plaintiffs] lack any meaningful control or authority over the quantity or price of the baked goods being distributed to Flowers' customers; the schedules for the deliveries; and the customer stores included on the routes."

The Distributor Agreements state that T&B is an "independent business" and that CK Sales does not control "the specific details or manner and means" of T&B's business. That

being said, many of the other terms in the agreement exert a significant amount of control over the details, manner, and means of T&B's business. The agreements obligate T&B to "use [T&B]'s commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory." And T&B must do so according to "Good Industry Practice," which involves "actively soliciting all Outlets in the Territory not being serviced"; "maintaining proper service and delivery to all Outlets in the Territory requesting service in accordance with Outlet's requirements"; and adhering to a number of requirements relating to, e.g., sanitation, safety, product freshness, and regulatory compliance. The agreements also require T&B to: "cooperate with [CK Sales] on its marketing and sales efforts and ensure its employee(s) maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with [CK Sales], and customer requirements"; obtain T&B's own delivery vehicles and "maintain [T&B's] delivery vehicle(s) in such condition as to provide safe, prompt, and regular service to all customers"; and use CK Sales' "proprietary administrative services" for certain purposes such as collecting sales data and communicating with CK Sales. If T&B believes that a certain account has become unprofitable, it must meet with CK Sales and implement CK Sales' recommendations to attempt to remedy the unprofitability. If CK Sales agrees that the unprofitability

cannot be remedied, "[T&B] shall be relieved of its contractual obligation to service such account(s) for a period of time determined by [CK Sales]."

The Distributor Agreements "do[] not require that [T&B's] obligations hereunder be conducted personally by Owner or by any specific individual in [T&B's] organization." T&B is "free to engage such persons as [T&B] deems appropriate to assist in discharging [T&B's] responsibilities." T&B hired at least one part-time employee.

The Distributor Agreements also contain an arbitration clause stating:

> The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either [T&B] (including its owner or owners) may have against [CK Sales] (and/or its affiliated companies and its and/or their directors, officers, managers, employees, and agents and their successors and assigns) or that [CK Sales] may have against [T&B] (or its owners, directors, officers, managers, employees, and agents), arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between [T&B] and [CK Sales] ("Agreement"), including the termination of the Agreement, services provided to [CK Sales] by [T&B], or any other association that [T&B] may have with [CK Sales] ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any

successor rules, except as otherwise agreed to
by the parties and/or specified herein.

"Covered Claims" expressly include "any claims challenging the independent contractor status of [T&B], claims alleging that [T&B] was misclassified as an independent contractor, any other claims premised on [T&B's] alleged status as anything other than an independent contractor, . . . and claims for alleged unpaid compensation, civil penalties, or statutory penalties under either federal or state law."

Although the Distributor Agreements were signed on behalf of T&B, plaintiffs each signed a "Personal Guaranty" acknowledging that they are subject to the arbitration clause. These documents also state that if T&B fails to comply with any term in the agreement, plaintiffs "will, upon [CK Sales'] demand, immediately ensure the timely and complete performance of [T&B] of each and every obligation and duty imposed on it by the Distributor Agreement, and/or pay any amounts due and owing due to [T&B's] breach."

Plaintiffs filed suit in June 2021, alleging that defendants misclassified them as independent contractors. Plaintiffs sought unpaid wages, overtime compensation, and other damages. Defendants filed a motion to dismiss or, in the alternative, to compel arbitration under the FAA. Anticipating that plaintiffs would invoke the FAA's section 1 exemption for

transportation workers engaged in interstate commerce, defendants advanced two arguments for finding the section 1 exemption inapplicable: first, that plaintiffs' responsibilities under the Distributor Agreements extend significantly beyond the mere transportation of goods; and, second, that plaintiffs do not work in the transportation industry because the business for which they work is not in the transportation industry.

Sure enough, plaintiffs opposed defendants' motion and argued, among other things, that they fell within the section 1 exemption. They asserted that "[t]he work which Plaintiffs engage in daily consists of transporting goods in the stream of interstate commerce." Defendants filed a response to plaintiffs' opposition in which they again argued that plaintiffs are more than just delivery drivers.

The district court, considering the arguments presented to it, denied defendants' motion to dismiss, concluding that plaintiffs fell within the FAA's section 1 exemption. Having found the FAA inapplicable, the district court allowed defendants to file a renewed motion addressing only the issue of arbitration under state law. Defendants opted to file this timely appeal instead. We have jurisdiction under 9 U.S.C. § 16(a).

## II.

In reviewing the district court's resolution of a motion to compel arbitration, we review legal issues de novo and factual

determinations for clear error. Fraga v. Premium Retail Servs., Inc., 61 F.4th 228, 233 (1st Cir. 2023); Cullinane v. Uber Techs., Inc., 893 F.3d 53, 60 (1st Cir. 2018).

Resolving this case requires interpreting section 1 of the FAA, which exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from the FAA's general command that arbitration agreements be enforced. 9 U.S.C. § 1. This exemption is "afforded a narrow construction" under which it applies only to "contracts of employment of transportation workers." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 118-19 (2001). In addition, "[t]o be 'engaged in' interstate commerce, a class of workers 'must at least play a direct and "necessary role in the free flow of goods" across borders.' That is, the class of workers 'must be actively "engaged in transportation" of those goods across borders via the channels of foreign or interstate commerce.'" Fraga, 61 F.4th at 237 (citations omitted) (quoting Sw. Airlines Co. v. Saxon, 142 S. Ct. 1783, 1790 (2022)).

On appeal, defendants make four arguments why the section 1 exemption does not apply to plaintiffs. First, that plaintiffs are not "engaged in" interstate commerce because their deliveries occur entirely within the borders of Massachusetts, and the baked goods' prior interstate journey to Massachusetts is insufficient to bring plaintiffs' intrastate transportation within

- 10 -

the channels of interstate commerce. Second, that plaintiffs' primary responsibilities are those of business owners, not transportation workers. Third, that plaintiffs do not themselves have "contracts of employment" with defendants, as that term is used in section 1, because the Distributor Agreements were signed on behalf of T&B and not plaintiffs personally. And fourth, that plaintiffs necessarily cannot qualify for the section 1 exemption because they do not work in the transportation industry.

**A.**

Defendants did not present their first argument to the district court. See McCoy v. MIT, 950 F.2d 13, 22 (1st Cir. 1991) ("[T]heories not raised squarely in the district court cannot be surfaced for the first time on appeal."). In none of defendants' filings in the district court did they argue that plaintiffs' transportation of goods is not interstate in nature because it occurs entirely within Massachusetts. Nor did defendants contest plaintiffs' assertion that they transport "goods in the stream of interstate commerce," or that such transportation is sufficient to satisfy the interstate commerce element of section 1.

In recounting the facts for the district court, defendants did point out in a footnote that "neither Plaintiffs nor those they hire were required to cross state lines in operating T&B as all of their territories were entirely in Massachusetts." But this observation never factored into defendants' argument that

- 11 -

the section 1 exemption did not apply.  See, e.g., United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("Passing allusions are not adequate to preserve an argument in either a trial or an appellate venue."); In re New Motor Vehicles Canadian Exp. Antitrust Litig., 533 F.3d 1, 6 & n.5 (1st Cir. 2008) (finding argument waived where party noted a fact before the district court but "did not argue that [the fact] had any legal significance"). In any event, such a statement does nothing to counter plaintiffs' argument that they qualify for the exemption because the goods they transport are in the stream of interstate commerce.  Nor does this case present "the most extraordinary circumstances" under which we will consider on appeal an argument not made to the district court.  Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).  Defendants neither developed the argument below nor argued that plaintiffs were obligated to submit further evidence bearing on the issue in the absence of any challenge by defendants.  As a result, the record is scant on information pertaining to whether plaintiffs' intrastate transportation of the baked goods is a continuation of the same interstate journey that brings the goods to the Massachusetts warehouse or a separate, purely intrastate journey.[1]  The argument is therefore waived.

---

[1]  Such information would include, for example, whether the goods are ordered to the warehouse pursuant to a prior contract or

Defendants also failed to present to the district court their third argument (that plaintiffs are ineligible for the section 1 exemption because they personally do not have "contracts of employment" as that term is used in the statute). Defendants argue that they preserved this argument because they "consistently pointed out . . . that 'the Distributor Agreement is signed on behalf of T&B,'" and because they "consistently argued that Plaintiffs' status and relationship to Flowers as business owners, not transportation workers, controls the [section] 1 analysis." But, as we just said, merely pointing out a fact is not the same as developing an argument about that fact's legal significance. See, e.g., Slade, 980 F.2d at 30; New Motor Vehicles Canadian Exp. Antitrust Litig., 533 F.3d at 6 & n.5. And defendants' argument that plaintiffs are business owners, not transportation workers, which defendants preserved, does not subsume the very different argument that plaintiffs do not have "contracts of employment"

---

understanding with the ultimate recipients or whether the shipments to the warehouse populate a general inventory from which subsequent in-state orders are filled. See, e.g., Fraga, 61 F.4th at 241 (distinguishing materials that "began their interstate journeys intended for specific retail stores" from parts shipped interstate to a "general inventory" and then delivered later when it is "determine[d] the part is required"); cf. Walling v. Jacksonville Paper Co., 317 U.S. 564, 569-70 (1943) (holding that goods ordered by a wholesaler based on anticipation of need, as opposed to "pursuant to a prior order, contract, or understanding," may no longer be traveling in interstate commerce when delivered to the wholesaler's in-state customers for purposes of the Fair Labor Standards Act).

with defendants because they are not signatories to the Distributor Agreements in their personal capacities. This latter argument is therefore also waived.

**B.**

Having found two of defendants' arguments waived, we address the merits of defendants' remaining arguments, beginning with the contention that plaintiffs do not fit within the section 1 exemption because the business for which they do their work is not in the transportation industry. This contention does not survive our recent analysis in Fraga of how to determine whether a worker belongs to a class of transportation workers. Fraga reiterated Saxon's holding, based on the text of section 1, that the inquiry trains "on what [the worker] does at [the company], not what [the company] does generally." Fraga, 61 F.4th at 235 (alterations in original) (quoting Saxon, 142 S. Ct. at 1788). In Saxon, the Supreme Court rejected the plaintiff's "industrywide approach" in arguing that all airline employees are covered by section 1 "because air transportation '[a]s an industry' is engaged in interstate commerce." 142 S. Ct. at 1788 (alteration in original). Fraga construed Saxon's focus on the worker's work rather than the company's industry to mean that employment within the "transportation industry," however defined, is neither sufficient nor necessary to qualify as a transportation worker for purposes of section 1. Fraga, 61 F.4th at 235. Simply put, "workers who

- 14 -

do transportation work are transportation workers." Id. So we held that an employee of a retail services company may qualify as a transportation worker for purposes of section 1, based on the work that she actually performed. Id. at 237. So, too, here. We look to what work plaintiffs do, not what defendants do generally.

## C.

That brings us to defendants' remaining preserved challenge to the district court's ruling: that plaintiffs' responsibilities are those of a business owner, rather than those of a transportation worker. This argument runs smack into the facts as found by the district court -- each plaintiff spends a minimum of fifty hours per week driving their delivery routes to deliver goods. There is no evidence in the record to suggest that this finding comes anywhere close to clear error.

Nevertheless, defendants maintain that, despite transporting goods for fifty hours or more each week, plaintiffs are not transportation workers because transportation is not their primary responsibility. Defendants contend that plaintiffs are, rather, "independent franchisee business owners" whose business "has a wide variety of sales and customer-service responsibilities." Specifically, defendants point to plaintiffs' responsibilities of "'obtain[ing] . . . delivery vehicle(s) and purchas[ing] adequate insurance thereon'; mak[ing] and us[ing] 'advertising materials'; and hir[ing] any necessary employees"

(citations omitted). Defendants aver that business plans submitted by plaintiffs prove that plaintiffs perform a variety of tasks other than delivery and that they use business acumen to grow the value of their business.

Fraga, though, held that workers do not need to be "primarily" devoted to transportation in order to qualify for the section 1 exemption. Fraga, 61 F.4th at 236-37. Instead, Fraga and Saxon make clear that workers who perform transportation work "frequently" are transportation workers. Id.; Saxon, 142 S. Ct. at 1788-89, 1793. Workers who frequently perform transportation work do not have their transportation-worker status revoked merely because they also have other responsibilities. In Saxon, the Supreme Court held that the plaintiff was a transportation worker based on her frequent filling in to help load cargo on and off airplanes, even though as a "ramp supervisor" she was also responsible for training and supervising rather than loading cargo. 142 S. Ct. at 1787, 1789. And the Court so concluded without suggesting that it need also find that training and supervising transportation workers was itself transportation work. Id. at 1789 n.1. Similarly, in Fraga, we held that merchandisers who transported display materials to stores could qualify as transportation workers even though it was undisputed that they had other duties unrelated to transportation. Fraga, 61 F.4th at 237. Here, plaintiffs frequently deliver goods in trucks to stores. So

they are transportation workers, even though they may also be responsible for other tasks associated with running a distribution business.

Defendants contend that we should look past the substance of plaintiffs' actual work because plaintiffs could have structured their distributorships so as to delegate driving to other persons. They argue that the relevant class of workers is the class of workers who own companies that distribute defendants' products. And the only way to determine what that class does, defendants continue, is to look at those workers' "job description[s]" as provided in the Distributor Agreements, which state that owners need not personally engage in any transportation. Relatedly, defendants maintain that even if we do look to plaintiffs' actual work, we must also look to the actual work of other owners of distributor companies, to determine what work "the members of the class, as a whole, typically carry out" (quoting Saxon, 142 S. Ct. at 1788).

Defendants misconstrue the relevant class of workers, which is not strictly limited by the worker's job title or job description. In Saxon, as a "ramp supervisor," the plaintiff's job duties were "[o]stensibly . . . meant to be purely supervisory." Saxon v. Sw. Airlines Co., 993 F.3d 492, 494 (7th Cir. 2021). But the Supreme Court nevertheless held that, "as relevant," she belonged to a class of "airplane cargo

- 17 -

loaders" -- that is, "a class of workers who physically load and unload cargo on and off airplanes on a frequent basis" -- because in practice she frequently stepped in to load cargo alongside the ramp agents that she supervised. Saxon, 142 S. Ct. at 1789. So the plaintiff in Saxon belonged to the relevant class of cargo loaders, even though she also belonged to a class of workers who supervise cargo loading. Id. at 1793 ("Saxon frequently loads and unloads cargo on and off airplanes that travel in interstate commerce. She therefore belongs to a 'class of workers engaged in foreign or interstate commerce' to which [section] 1's exemption applies."). And that makes sense, because any individual can be said to fall into a variety of different classes of workers depending on the relevant inquiry (e.g., a class of workers who reside in Massachusetts, a class of workers who receive hourly wages, etc.).

Here, plaintiffs deliver goods in trucks to stores for at least fifty hours every week. They therefore belong to a class of workers who frequently deliver goods in trucks to stores. Defendants offer no reason why that class is not a class of transportation workers. And plaintiffs' additional membership in a class of workers who own companies that distribute products for defendants does not remove them from the class of workers who deliver goods -- just as the Saxon plaintiff's membership in a

class of workers who supervise cargo loading did not remove her from the class of workers who physically load cargo.

In sum, the arguments that defendants preserved fail under recent First Circuit and Supreme Court precedent. We express no view in this opinion as to the merits of defendants' waived arguments, other than to confirm their waiver.[2]

### III.

For the foregoing reasons, we <u>affirm</u> the district court's denial of defendants' motion to dismiss this lawsuit or to compel arbitration.

---

[2] The legal arguments in the amicus brief submitted by the Chamber of Commerce largely echo those made by defendants, and fail for the same reasons.